IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37943-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DARNAI LEON VAILE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — When sheriff deputies responded to a report of an unwanted kissing at a Spokane Valley bar, they found a large group of people in the parking lot. As they interviewed witnesses, Darnai Vaile approached them. After indicating that he had a knife, Vaile and the deputies struggled, with the deputies using brute force to bring Vaile to the ground and handcuff him.

At trial, several witnesses testified that Vaile was not being aggressive or confrontational with the deputies. Vaile presented a 10-second cell phone video taken by an onlooker that recorded him on the ground struggling with deputies who were trying to handcuff him. The recording includes audio statements made by the person recording and by Vaile, who can be heard exclaiming that he is "not doing nothing. I'm putting my arm right here." Ex. D-103. The trial court determined that the statements were

inadmissible hearsay and while allowing Vaile to play the video, excluded the audio

statements from being played to the jury. Despite this ruling, the court allowed Vaile to

testify about the statements he made during his arrest that were captured in the audio

recording.

The jury found Vaile not guilty of two counts of third degree assault, but guilty of

resisting arrest.

On appeal, Vaile raises three assignments of error; two of them related to the trial

court's evidentiary ruling excluding the audio statements made in the video. First, he

argues that the recorded statements qualified as exceptions to the hearsay rule as either

excited utterance or then-existing condition and the trial court abused its discretion by

excluding the statements. Alternatively, Vaile contends that the exclusion violated his

constitutional right to present a defense. We agree in part with the trial court's

evidentiary rulings, but in balancing the lack of prejudice to the State against the

compelling nature of Vaile's recorded statement, we hold that excluding the evidence

violated Vaile's constitutional right to present a defense. We therefore reverse Vaile's

conviction for resisting arrest and remand for a new trial.[1]

---

[1] Vaile's third assignment of error challenged a scrivener's error in the judgment and sentence. Since we reverse his conviction and remand, we do not address this third issue.

2

BACKGROUND

We begin by acknowledging that this is an emotionally and racially charged case. As defense counsel noted in her opening statement, it is a case about perceptions. The police have the perception of a very large (6'10" 300 pound) suspect coming toward them yelling with fists clenched who is refusing to comply with commands to stop and sit. When they indicated they were going to pat him for weapons, Vaile indicated that he had a knife and then reached into his pocket and refused to comply with commands to remove his hands or drop the knife. After tossing the knife to the ground, Vaile continued to struggle with police. It took several deputies to get Vaile on the ground. An officer admittedly struck him with a baton and kneeled on him in order to handcuff him.

Darnai Vaile and several of his witnesses have a different perspective. They testified that Vaile tried to cooperate by walking toward the police with his arms up and his hands open, volunteering that he had a knife and he was trying to give it to the officers. Vaile and his witnesses believe that police overreacted in taking Vaile to the ground. They testified that the police were "beating" Vaile despite Vaile's attempts to comply. Vaile testified that once on the ground, he attempted to cooperate but could not get his hands out from underneath him because the police were kneeling on him.

Despite the racial overtones of the incident, Vaile raises only two challenges to his conviction, both of them pertaining to the exclusion of recorded statements. He did not raise any issues in his assignments of error or briefing claiming his arrest or conviction

3

were infected by racism. Nevertheless, the separate opinion sua sponte raises and then finds as a factual matter that most of those involved in this case are guilty of intentional racism or even worse, apathy. We disagree with this path for two reasons.

First, our justice system is based on the principle of party presentation, in which the courts, as neutral arbiters, generally decide only the issues raised by the parties. *United States v. Sineneng-Smith*, __ U.S. __, 140 S. Ct. 1575, 1579, 206 L. Ed. 2d 866 (2020). As Justice Ginsburg noted in one of her last majority opinions, "[courts] do not, or should not, sally forth each day looking for wrongs to right," but rather should "normally decide only questions presented by the parties." *Id*. at 1579. While this principle is not ironclad and should yield under extraordinary circumstances, in this case we are reversing on grounds raised by the appellant and do not need to take the extraordinary step of deciding the case on grounds not raised or briefed by the parties.

Second, when appellate courts begin deciding facts and issues sua sponte, it raises concerns of partiality and lack of neutrality. "What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991).

Systemic racism exists and we continue to work toward its eradication. And while history, statistics, current events, and human nature must inform our decisions, they

cannot be used as the basis for a decision when racism has not been raised, briefed, or found. This is not to say that it did not exist in this case. But the separate opinion's conclusion of racism relies on information outside the record, facts that have not been found, and issues that have not been raised. We do not consider the Supreme Court's directive to require courts to raise issues sua sponte or decide cases on issues that the parties have not briefed. Since we are reversing Vaile's conviction, there is no need for additional briefing on matters not raised by the parties.

The case began at the Peking Palace Restaurant where sisters Patricia Murray and Julia Napier were socializing, playing pool, and singing karaoke. During the evening they met Darnai Vaile. At one point, Vaile kissed Murray without her consent, and she called the police.

When Deputies Michael Vicini and Clay Hilton arrived, there was a large group of people in the parking lot, including Murray and her sister Napier. Deputy Vicini made contact with Murray who began to explain what happened. After Murray described the person who kissed her, Vaile walked around a corner and began approaching Deputy Vicini and Murray. Deputy Vicini testified that Vaile matched the description of the suspect provided by Murray.[2]

---

[2] Murray's description to Deputy Vicini was not included in the record, but Vaile was described by Deputy Vicini as a large man, six feet, ten inches tall, weighing over 300 pounds. It was also acknowledged during voir dire that Vaile is African-American.

Deputies Vicini and Hilton both testified that Vaile approached Deputy Vicini and Murray in an aggressive manner, yelling with fists clenched. Vaile pushed passed someone who tried to stop him, and continued toward the deputy, yelling that he wanted to tell his side of the story. As Vaile approached, Deputy Vicini told Vaile to stop and sit on the curb. Vaile refused these commands and circled around behind Deputy Vicini.

Based on Vaile's agitated demeanor and their concern for safety, Deputy Hilton told Vaile that he was going to pat Vaile down for weapons. Vaile volunteered that he had a knife and put his hand in his pocket. Deputy Vicini grabbed Vaile's wrist and told Vaile to leave the knife in his pocket. Vaile did not comply, which caused Deputy Vicini concern for his safety.

Deputies Vicini and Hilton continued to struggle with Vaile. At one point, while Deputy Vicini had two hands on Vaile's wrist, Deputy Hilton testified that Vaile was able to lift Deputy Vicini off the ground and pull out the knife. Vaile dropped the knife on the ground. At this point, Deputy Criswell[3] joined the struggle and Vaile was struck with a baton. Deputy Vicini testified that the strike had no effect on Vaile who continued to struggle with the three officers. One or more officers conducted a leg sweep on Vaile and took him to the ground.

---

[3] At the time of Vaile's arrest Criswell was a deputy, but has since been promoted to Sergeant.

6

As they were struggling with Vaile, a crowd of people approached and began yelling at the officers, refusing to comply with commands to back up. The officers were able to get Vaile on his stomach, but he refused commands to remove his hands from underneath his body. With possibly three or four officers on top of him, and Deputy Hilton's knee on his head, deputies were able to handcuff Vaile.

Deputy Vicini acknowledged that Vaile was not making threats to the officers, and was not threatening the officers with the knife. Other than resisting his arrest, Vaile was not fighting with the officers. Deputy Hilton acknowledged that Vaile was not making verbal threats toward the officers or attempting to physically assault them.

As Deputy Vicini was handcuffing Vaile, Deputy Hilton turned toward the crowd who had gathered nearby. Deputy Hilton testified that Murray and Napier were within arm's reach of Deputy Hilton and were yelling and screaming at the officers. Deputy Hilton testified that he told Murray and particularly Napier to get back several times. When Napier refused to step back, Deputy Hilton told her she was under arrest for obstructing. As he reached for his handcuffs, Napier spun around and hit Deputy Hilton in the face, leaving a red mark under his eye. Deputy Hilton put Napier in a "hair hold" and took her to the ground and placed her in handcuffs.[4]

---

[4] Napier was tried with Vicini and the jury found her guilty of third degree assault. Her conviction was affirmed on appeal. *See State v. Napier*, No. 37892-6-III (Wash. Ct. App. July 21, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf /378926_unp.pdf, *review denied*, 200 Wn.2d 1015, 519 P.3d 592 (2022).

In addition to their own testimony, defendants Vaile and Napier called three witnesses who were also at the restaurant that night.[5] These witnesses testified that as Vaile approached the officers in the parking lot, he either had his hands at his side or was walking with his hands up and palms open. While he walked quickly, he was not acting aggressively. Several witnesses remembered deputies telling Vaile to stop, but testified that within seconds of reaching the deputies, Vaile was on the ground. At least three witnesses testified that as they were taking Vaile to the ground, deputies began to strike or "beat" Vaile with their batons. The witnesses were clear that Vaile was not fighting, pushing or attacking the officers.

Vaile testified that he went outside of the restaurant because he knew police were arriving. When he saw the officers talking to Murray, he began to approach with his hands open. Vaile said that he was nervous about getting in trouble and put his hands in his pockets only to realize that he had a knife. Vaile indicated that the officer had his hand on his weapon and Vaile was scared of getting shot, so he jumped back and said, "I have a knife." Rep. of Proc. (RP) at 582. Vaile testified that he tossed the knife on the ground and walked over to the patrol car at the deputy's request.

As he was talking to the deputy, another officer came around the car and hit Vaile in the sternum. At that point, Vaile remembered being hit in the sternum, the side, and the back of the legs by different officers before falling face first to the ground. Vaile

---

[5] Napier's sister, Murray, was called as a witness by the State.

indicated that he was in pain but trying to adjust himself so that the officers could put his

wrists together:

> [VAILE]:  I was trying to adjust myself, so they can put my wrists together because the way they had me right now, I couldn't put my wrists together, and he had one arm way up here because—
>> [VAILE]: Can I stand real quick?
>> THE COURT: You may.
>> [VAILE]: He had one arm way up here and the other here, and he was trying to put my hands together like this, the wrists together like this, and I couldn't do it.
>>> [COUNSEL]: Were you trying to say anything?  Did you tell them anything?
>
> A:  *Yes. I told them I can't put my wrists together.*
> Q:  And what happened next?  Did they do anything to help you?
> A:  No.
> Q:  How did you eventually get to a place where your hands could be put together?
> A:  I started forcing my arm down, and I said put my arm here, and he still had one of my arms up here, and he said stop resisting and then—
> Q:  Let's stop there.  And thank you, you can go ahead and have a seat.  So you say you had to push—he pushed your arm down?
> A:  Yes.
> Q:  All right.  And were you deliberately trying to resist an arrest?
> A:  No.
> Q:  And so what was the intent that you had?
> A:  Just trying to help them handcuff me.
> Q:  And did you—eventually you were handcuffed, right?
> A:  Yes.
> Q:  And so after that happened and you were handcuffed, what happened next?
> A:  They got me up eventually and then brought me to the police car.

RP at 587-88 (emphasis added).

While Vaile was being arrested, Murray took a 10 second video of Vaile on the ground with police on top of him. As she was recording, Murray could be heard saying, "You stop right now you do not need to restrain him like that! He's okay! He's a gentle, kind person." Ex. D-103. At the same time, and somewhat overlapping Murray's comments, Vaile can be heard saying, "I'm not doing nothing. I'm putting my arm right here." *Id.*

The State moved to exclude the recorded statements as hearsay. Defense counsel argued that the statements fell within the hearsay exception as excited utterance and then-existing condition. After considerable discussion, the court agreed with the State and allowed defense counsel to play video but excluded the audio. In doing so, the court noted in passing that Vaile would be allowed to testify about his statement. At the close of the State's case, the court dismissed the weapon charge for insufficient evidence. The jury found Vaile not guilty on both counts of third degree assault, but found him guilty of two counts of resisting arrest. At sentencing, the trial court agreed with the parties and merged the two counts of resisting arrest.

## ANALYSIS

Vaile argues that the trial court abused its discretion by excluding the recorded statements by himself and Murray. He also contends that the exclusion violated his constitutional right to present a defense. Under the evidence rules, Vaile contends that

10

the recorded statements qualified as excited utterance or then-existing condition.  The State responds that the recorded statements were inadmissible hearsay statements.

When presented with an argument that an evidentiary ruling violated a defendant's right to present a defense, we first analyze the trial court's decision for abuse of discretion under the rules of evidence.  *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022).  If abuse of discretion is found, and the error is not harmless, we reverse on the evidentiary ruling and avoid the constitutional question.  *Id.* at 59.  But if no abuse of discretion is found, we consider the constitutional question de novo.  *Id*. at 58-59.

1.    EVIDENCE RULES

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  ER 801(c).  Hearsay evidence is generally inadmissible.  ER 802.  The prohibition on hearsay "prevent[s] the jury from hearing statements without giving the opposing party a chance to challenge the declarants' assertions."  *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 451-52, 191 P.3d 879 (2008).  Hearsay statements include recorded audio statements.  A recorded hearsay statement is admissible only if subject to a valid exception.  *See Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 195-96, 668 P.2d 571 (1983); *State v. Sanchez*, 42 Wn. App. 225, 230-31, 711 P.2d 1029 (1985).

There were two statements included in Murray's 10-second recording: Murray's statement and Vaile's statement.  We apply the evidence rules to each statement.

11

On appeal Vaile acknowledges that his recorded statement was hearsay, but argues that the statement qualifies as either an excited utterance under ER 803(a)(2) or then-existing condition under ER 803(a)(3). The separate opinion contends that the statement does not amount to hearsay and decides the issue on that basis. This argument was not raised by Vaile and we disagree with the evidentiary analysis in the separate opinion.[6]

The excited utterance exception permits the admission of a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). Three closely connected requirements must be satisfied under the exception: (1) a startling event or condition occurred, (2) the statement was made while the declarant was under the stress or excitement caused by the startling event or condition, and (3) the statement must relate to the startling event or condition. *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

At the time Vaile made his statement, he was on the ground with three or four police deputies holding him down, one with his knee on Vaile's head, trying to handcuff Vaile. The trial court gave no explanation as to why Vaile's statement did not qualify as an excited utterance. On appeal, the State suggests that the startling event, if one existed,

---

[6] The separate opinion contends that Vaile alternatively argues that his statement did not constitute hearsay. Concurrence/Dissent at 4. This is not accurate. Vaile never claims within his brief that his recorded statement does not qualify as hearsay and never cites ER 801(c) in his brief. Instead, Vaile raised two alternative theories for admission of his statement, excited utterance (Br. of Appellant at 15) and then-existing state of mind (Br. of Appellant at 19).

was limited to being taken to the ground, and Vaile failed to demonstrate how long after being taken to the ground that he made the statement heard on the recording. We disagree with the State's attempt to artificially narrow the startling event.

Vaile's statement was clearly an excited utterance. At the time Vaile made his statement, he was under the stress of being hit with batons, taken to the ground by three or four deputies and handcuffed. His statement was related to the event as he was expressing his attempts to comply with the officer's demands to move his hands.[7]

The separate opinion asserts that Vaile's comment does not qualify as hearsay because it was not being introduced to prove the truth of the matter asserted. Instead, the separate opinion maintains that the recorded statement communicated Vaile's intent. Concurrence/Dissent at 6. We agree that Vaile's statement communicated his intent. It still qualifies as hearsay however. The only reason Vaile wanted to introduce his recorded statement was to prove that it was true; that he did not intend to resist arrest and was moving his arm so deputies could hand-cuff him.

Usually, when the State introduces a criminal defendant's out-of-court statement, it is admitted as an admission of a party-opponent under ER 801(d)(2) and is not considered hearsay. However, this rule does not apply when a party attempts to introduce

---

[7] Because we conclude that the statement qualified as an excited utterance, we do not need to address the alternative exception of a then-existing condition under ER 803(a)(3).

13

their own statement through another witness unless a hearsay exception applies. *State v. Finch*, 137 Wn.2d 792, 975 P.2d 967 (1999) (defendant not allowed to call witness to recount exculpatory out-of-court statement by defendant). On rare occasions, a criminal defendant may be able to introduce his own out-of-court statement even when an exception does not apply, if the statement was introduced as circumstantial evidence of something other than the facts described in the statement, such as the defendant's state of mind. 5D KARL B. TEGLAND & ELIZABETH A. TURNER, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 803, at 431 (2022). In these circumstances, the statement is not hearsay because it is not introduced to prove the truth of the matter asserted.

The separate opinion suggests that when intent is an element of a crime, the defendant's out-of-court statement made contemporaneously at the time of the alleged crime must be admitted. Concurrence/Dissent at 6. The cases cited by the separate opinion do not support its conclusion. In *State v. Garcia*, 179 Wn.2d 828, 318 P.3d 266 (2014), the defendant was charged with kidnapping after entering a home and remaining with the victim for several hours while explaining to her that people with guns were chasing him and he needed a ride. The court held that the defendant's statements were not being introduced to prove the truth of the matters asserted, i.e., that people with guns were chasing him, but rather to show what the defendant believed and how his belief affected his intent when entering the home. *Id*. at 845.

The two other cases cited by the separate opinion do not mention, much less analyze and decide issues pertaining to hearsay and ER 801. *See State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496 (2013); *State v. Ware*, 111 Wn. App. 738, 46 P.3d 280 (2002).

The separate opinion does not explain how Vaile's recorded statement is relevant if it is not true, and Vaile himself makes no attempt to argue on appeal that his statement was not being introduced to prove something other than the truth of the matter asserted. While his statement constitutes hearsay, it also falls within at least one of the hearsay exceptions.

We turn next to Murray's recorded statements. Vaile contends that Murray's statements also qualified as either an excited utterance under ER 803(a)(2) or then-existing mental, emotional, or physical condition. under ER 803(a)(3), which provides that:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The trial court did not find that Murray's statements qualified as a hearsay exception for several reasons. First, the court noted that Murray was making the recording and knew that her statements were being recorded. The court surmised that her statements were more reflective as opposed to spontaneous statements made while under

15

the stress of the event. In addition, as the State pointed out, Murray's statements did not relate to the event or describe the event because she was making character comments without a basis.

There is no evidence that Murray knew Vaile before this event, and yet she is describing him in the video as kind and gentle. Like many hearsay exceptions, the excited utterance rule is premised on the theory that statements falling within its ambit are inherently trustworthy. The declarant's spontaneous response to an external shock prevents him or her from reflecting on and controlling any resulting utterances. *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992). The startling circumstances overcome the speaker's ability to consciously fabricate. *State v. Dixon*, 37 Wn. App. 867, 872, 684 P.2d 725 (1984). In light of the circumstances, the trial court did not abuse its discretion in finding that Murray's statements did not qualify as excited utterance or then-existing condition. Murray's statements did not relate to the event or describe her own state of mind or condition, nor did Vaile lay a foundation that she knew him well enough to provide an opinion on his character of gentleness.

The trial court indicated that even if it wanted to admit Vaile's statement, neither party presented the court with a redacted version of the recording. In other words, the trial court's only options were to admit all of the statements or none of the statements. The trial court decided that the best way to handle this was to play the video without the

16

audio and allow Vaile to testify about his statement. Under an abuse of discretion standard, the trial court's decision was a reasonable way to handle the issue.

2.      CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

Ordinarily, we would end our analysis upon finding no abuse of discretion. But Vaile argues on appeal that the exclusion of his recorded statement violated his constitutional right to present a defense.[8] The State responds that Vaile was not denied the ability to put on a defense because the statement did not constitute Vaile's entire defense, and the court allowed Vaile to testify about his statement while he was on the stand.

When a defendant challenges a trial court's exclusion of evidence as a violation of the evidence rules and a violation of the constitutional right to present a defense, there are three possible scenarios:

> If the trial court abused its discretion in making an evidentiary ruling, and the ruling was prejudicial to the defendant, we would avoid the constitutional issue altogether. On the other hand, if the abuse of discretion constituted harmless error, we would address the constitutional standard. Lastly, if the trial court did not abuse its discretion, then we would review the constitutional issue.

---

[8] Although Vaile did not raise this argument below, the State does not suggest that the issue is waived. Regardless, we exercise our discretion to consider the issue. RAP 2.5(a).

17

*Jennings*, 199 Wn.2d at 59 (quoting *State v. Jennings*, 14 Wn. App. 2d 779, 800-01, 474 P.3d 599 (2020) (Melnick, J., concurring) (footnote omitted in original). In this case, we are presented with the third scenario.

"A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." *Id.* at 63 (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22). While defendants do not have a right to introduce evidence that is irrelevant, repetitive, or poses an undue risk of harassment, prejudice, or confusion, when the defendant's proposed evidence is relevant, the court must consider the defendant's right to present a defense in balancing the relevance against any prejudice to the State. *Id.* In other words, "'the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted.'" *Id.* at 65 (quoting *State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019)).

The question presented here is whether the trial court's exclusion of Vaile's recorded statement, while not an abuse of discretion, nonetheless violated his right to present a defense. The State contends that excluding the recorded statement did not violate Vaile's right to present a defense because the statement was hearsay, cumulative, and did not constitute Vaile's entire defense.

In analyzing this issue, we consider the Supreme Court's application of this right under various circumstances. In *State v. Jones*, the Supreme Court reversed a conviction, finding that the trial court's exclusion of evidence regarding the alleged victim's conduct

on the night of the incident effectively barred the defendant from presenting his entire defense. 168 Wn.2d 713, 719-20, 230 P.3d 576 (2010). In *Arndt*, the court recognized that the constitutional right to present a defense requires courts to balance the State's interest in excluding evidence against the defendant's need for the information to be admitted. 194 Wn.2d at 812. The court also determined that since the defendant was able to offer evidence in support of her theory without the excluded evidence, the exclusion of evidence did not violate the defendant's right to present a defense. *Id*. at 814.

Using this same balancing test, the Supreme Court held that a defendant's right to present a defense was violated when the trial court severely limited defense counsel's ability to cross-examine the State's witness on issues of bias. *State v. Orn*, 197 Wn.2d 343, 482 P.3d 913 (2021). In balancing the competing interests, the court determined that the State had failed to demonstrate any prejudice against the defendant's need to show bias. *Id*. at 356.

In *Jennings*, the defendant raised self-defense but was prohibited from introducing a toxicology report showing that the victim had methamphetamine in his system when the defendant shot him. 199 Wn.2d 53. The Supreme court agreed with the State that the effects of methamphetamine on any particular person were speculative. *Id.* at 66. Since the defendant was allowed to present evidence about his subjective fear of the victim and his belief that the victim was high on methamphetamine, balancing the exclusion of

prejudicial and speculative evidence did not violate the defendant's ability to present a defense. *Id.*

Here, the State contends that the audio recording was prejudicial to the State and otherwise cumulative. While it characterizes Murray's statements as an "inebriated monologue," the State does not demonstrate prejudice from Murray's statements and makes no attempt to claim that Vaile's statement was prejudicial. Resp't Br. at 47. The State points out that Vaile called several witnesses, all of whom testified that Vaile was being compliant and Vaile himself was allowed to testify as to the statement he made while being arrested. Resp't Br. at 48-49. We disagree with the State's application of the balancing test.

Vaile's entire defense to the resisting charge was that he was trying to comply with commands. While several witnesses testified that Vaile was not being aggressive, none of them were allowed to testify about the statement Vaile made while being arrested. Moreover, excluding Vaile's recorded statement while acknowledging that he can later testify as to what he said, puts Vaile in a position of waiving his right to remain silent if he wants the evidence introduced. And while Vaile did testify that he told police that he could not put his wrists together, the recorded statement would have corroborated his testimony and likely would have carried more weight and credibility than his trial testimony. When this highly probative evidence is balanced against the lack of prejudice

20

to the State, we conclude that excluding Vaile's recorded statement violated his right to present a defense.[9]

We reverse Vaile's conviction for resisting arrest and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

I CONCUR:

_____
Lawrence-Berrey, J.

---

[9] If the State had any concern about Murray's inadmissible statements, it could have sought an admonition or limiting jury instruction.

FEARING, C.J. (concurring in part/dissenting in part) —

*That Justice is a blind goddess*
*Is a thing to which we blacks are wise.*
*Her bandage hides two festering sores*
*That once perhaps were eyes.*
Langston Hughes, 1923

This appeal presents a primer on racial prejudice inside America's criminal justice system. Racial bigotry permeates the case beginning with Patricia Murray's call to 911 and ending with the State attorney's summation to the jury.

The racism infecting the arrest and prosecution of Darnai Vaile prompts robust disagreement between the court majority and me about the role of a judge in exposing and eradicating racism within the justice system. That disagreement, in turn, prods this dissent. Like the majority, I would reverse Vaile's conviction for resisting arrest, but, unlike the majority, I would direct dismissal of the charge based on race-based government misconduct. Reversal and remand for a new trial does not suffice to correct the prejudice debasing African-American Vaile's prosecution. At the least, I would call for briefing from the parties on the remedy of dismissal or remand to the superior court for a hearing on dismissal because of government misconduct. Despite Vaile not seeking dismissal, this court holds authority to address and grant this relief.

The evidentiary issues resolved by the court majority pale in significance to the color bias, but still loom important. I agree with the majority's decision that the trial court mistakenly precluded the jury from hearing the audio of Darnai Vaile's voice recorded on Patricia Murray's cellphone camera. I, however, differ with the majority's basing of its ruling on the constitutional right to present a defense. I would avoid the constitutional question and rest the evidentiary ruling on Vaile's comments not constituting hearsay. I further disagree with the majority's exclusion of the comments of Patricia Murray also captured on the audio file of the camera video. Murray's remarks qualify under the excited utterance exception to the hearsay rule and should be heard by the jury.

This dissent first analyzes the evidentiary issues on appeal. The dissent then examines the racial prejudice suffered by Darnai Vaile. Finally, this dissent critiques the majority's critique of the dissent. My extensive differences with the majority on the evidentiary errors and this court's refusal to expose and remedy endemic racist bias prolong this opinion.

Vaile's Nonhearsay Recorded Remarks

The majority rests its ruling on the violation of Darnai Vaile's constitutional right to present a defense under the Sixth Amendment to the United States Constitution. Nevertheless, courts typically avoid reaching constitutional issues when possible. *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981). This possibility exists in Vaile's appeal.

When presented with an argument that an evidentiary ruling violated a defendant's right to present a defense, the court first analyzes the trial court's decision for abuse of discretion under the rules of evidence. *State v. Jennings*, 199 Wn.2d 53, 58-59, 502 P.3d 1255 (2022). If the trial court abused discretion and the error prejudiced the accused, the court will reverse on the evidentiary ruling and avoid the constitutional question. *State v. Jennings*, 199 Wn.2d 53, 59 (2022). I would hold the trial court abused discretion.

The majority rules that Darnai Vaile's comments qualified under the excited utterance exception. But then the majority reverses course and rules the exclusion not to be an abuse of discretion because Vaile's comments overlapped on the audio with the purportedly inadmissible comments of Patricia Murray. The majority reverses course once more and holds that the exclusion of the audio constituted constitutional error.

The majority cites no law that the trial court acts within the bounds of reasonable discretion when excluding an entire sound track because the recording contains some admissible remarks and some inadmissible remarks. Although this dissent also lacks any citation in support of its position, if an audio bears importance to the accused's defense, the bounds of discretion under evidence rules should only allow for the playing of the audio since the court may give a limiting instruction for the jury to ignore the inadmissible portion of the recording.

The majority highlights that neither party presented the trial court with a redacted version of the recording. Yet, we do not know if a party could have removed the entirety of Patricia Murray's comments without erasing some of the words spoken by Darnai

3

Vaile. Such a feat could have required the secretarial gymnastics of President Richard Nixon's assistant, Rose Mary Woods. Assuming redaction to be possible, we do not know the cost. The majority does not ponder whether the State should have borne the burden of redacting the audio if it deemed some of the language inadmissible, and the majority does not ask whether the State's failure to redact the recording, when it held possession of the recording for months, should have led to the playing of the audio.

Alas, this court need not fret about redaction of the video's audio. With little effort, this court may reverse the conviction on evidence rules and decisional law that applies those evidence rules and thereby avoid the constitutional claim. As analyzed later, the remarks of Patricia Murray on the sound recording were admissible under the excited utterance exception.

To repeat, the majority rules that Darnai Vaile's exclamatory remarks captured on the video qualified for the excited utterance exception to the hearsay rule. Nevertheless, the court need not address any exception to the hearsay rule since the comments do not constitute hearsay. No rule compels a court to first answer whether evidence constitutes hearsay before addressing whether a hearsay exception applies. Nevertheless, legal logic encourages a court to discern whether evidence is hearsay before perusing exceptions. One generally does not search for an exception to a rule before resolving whether the rule applies. In *United States v. Zagari*, 111 F.3d 307, 317–18 (2d Cir.1997) and *State v. Steward*, 2020-Ohio-4553, 159 N.E.3d 356, 366, the courts determined to first

address whether out-of-court statements qualified as nonhearsay before entertaining a hearsay exception.

The majority writes that Darnai Vaile fails to argue on appeal that his recorded statement does not constitute hearsay. Not true. Although he also advances hearsay exceptions, Vaile writes in his appeal brief that the sound recording bore relevance to the question of whether he intended to resist arrest, an element of the charged crime. Br. of Appellant at 20. This latter contention necessarily implicates ER 801(c), the definition of hearsay.

Also contrary to the claim of the court's majority, Darnai Vaile, at trial, principally argued that his excited remarks did not constitute hearsay, as opposed to relying only on an exception. Vaile's trial counsel intoned:

> MS. CADY: Well, what if this went to state of mind, and *this wasn't being offered for the truth of the matter* asserted depending on the context of the testimony?

Report of Proceedings (RP) at 151 (emphasis added). Vaile's counsel later added:

> But I think, Your Honor, *if the Court doesn't find that these statements got to the truth of the matter asserted*, *it goes to his state of mind in what's happening*, it's extremely relevant in—
> THE COURT: *Goes to whose state of mind?*
> MS. CADY: *Mr. Vaile's also*. There's—there are also, as Mr. Kidd [the State's attorney] pointed out, the deputies have testified they were in certain places, and they were doing certain things, and it's clear from these videos that they are not. So those things could be questioned, and Deputy Vicini just testified that he didn't hear him saying anything about his handcuffs, although he could have, and it's right in the video—but it was too loud. It's right in the video that you can hear him saying that, and Deputy Vicini is kneeling next to him or on him on the opposite side of where he said he was.

RP at 352 (emphasis added). Julie Napier's trial counsel also affirmed:

> MR. KIDD: Excited utterness [sic], present sense impression. *I'm not sure that it necessarily goes to the truth of the matter asserted either.* There are a number of different possibilities here, Your Honor.

RP at 299 (emphasis added).

Patricia Murray's recording captured Darnai Vaile exclaiming: I am "not doing nothing. I'm putting my arm right here." Exhibit (Ex.) D-103. Vaile correctly characterizes these comments as showing his state of mind.

A proponent may introduce state of mind evidence through two pathways. First, the party may wish the trier of fact to hear the out-of-court statement not for the purpose of the truth of the matter asserted within the statement, but for some other purpose relevant to the proceeding. In this first circumstance, the statement does not constitute hearsay under ER 801(c), and the proponent need not rely on any exception to the hearsay rule. Second, the party may desire the jury to deem the matter asserted inside the statement to be the truth. In this second circumstance, the proponent must claim the state of mind comment falls within the hearsay exception found in ER 803(a)(3). Appellate decisions sometimes fail to distinguish between these two avenues for introducing state of mind evidence. No rule precludes the proponent of the evidence from introducing the out-of-court statement for both the truth of the matter asserted and for another purpose.

The majority writes that the recorded statement did not convey Darnai Vaile's intent. The majority adds: "The only reason Vaile wanted to introduce his recorded statement was to prove that it was true; that he did not intend to resist arrest and was

6

moving his arm so deputies could hand-cuff him." (Majority opinion, page 14). The majority misses the irony of the passage. In the latter clause, the majority concedes that Vaile wanted the statement introduced to show he did not intend to resist arrest. Vaile's exclamation expressed his intent to do nothing other than to place his arm in the requested location. He expressed this intention regardless of whether his comment of holding his arm in place was accurate. Even assuming the statement could also be used to prove the truth of the matter asserted, this purpose does not negate the remarks' alternative nonhearsay nature.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Whether a statement is hearsay depends on the purpose for which the statement is offered. *State v. Garcia*, 179 Wn.2d 828, 845, 318 P.3d 266 (2014). Statements not offered to prove the truth of the matter asserted, but rather as a basis for inferring something else, are not hearsay. *State v. Garcia*, 179 Wn.2d 828, 845 (2014); *State v. Crowder*, 103 Wn. App. 20, 26, 11 P.3d 828 (2000).

When assessing whether an out-of-court statement comprises hearsay, we first identify the substantive questions for resolution by the jury. The State charged Vaile with resisting arrest. RCW 9A.76.040 defines resisting arrest as:

> (1) A person is guilty of resisting arrest if he or she *intentionally* prevents or attempts to prevent a peace officer from lawfully arresting him or her.

7

(Emphasis added.)  Under the language of the statute, the State must establish beyond a reasonable doubt that Vaile intended to resist.  Intent is a necessary element of the crime. *City of Seattle v. Gordon*, 54 Wn.2d 516, 520, 342 P.2d 604 (1959).

Darnai Vaile's recorded remarks communicated his contemporaneous intent to acquiesce to the law enforcement officers' commands.  The remarks expressed his intent to cooperate by placing his arms in the commanded position rather than to resist.

Numerous Washington decisions stand for the requirement that the trial court must allow the accused to introduce evidence of his comments contemporaneous to the time of the alleged crime when the charged crime includes an element of intent or knowledge.  In *State v. Garcia*, 179 Wn.2d 828 (2014), the Supreme Court ruled that statements of both the bystander and the defendant were not hearsay.  Phillip Garcia entered Juliana Wilkins' trailer through an unlocked door.  An agitated Garcia awoke Wilkins and the two spoke for two hours.  At some point, Garcia went to the kitchen and grabbed a knife. At trial, Wilkins testified Garcia terrified her.  She thought Garcia would kill her.  The State charged Garcia with kidnapping and burglary.  The State brought a motion in limine to preclude, based on hearsay, statements made by Garcia and Wilkins during their encounter.  The Supreme Court ruled that the trial court erroneously excluded the evidence, although the court held the error to be harmless.  The excluded statements uttered by Garcia demonstrated his state of mind.  His state of mind posed relevance to the charges because kidnapping hinged on his intent.

8

This court's majority agrees that, in *State v. Garcia*, the Supreme Court held that Phillip Garcia's statements were not being introduced to prove the truth of the matters asserted—that people with guns were chasing him—but rather to show what the defendant believed and how his belief affected his intent when entering the home. So too Darnai Vaile may introduce his comments to show that he believed he was cooperating such that he lacked intent to resist arrest.

In *State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496 (2013), this court did not resolve any evidentiary dispute, but considered comments by the accused to be relevant to the calculation of guilt. The jury heard and the trial court reviewed evidence of Donald Calvin's comments and the park ranger's statements uttered during the course of their encounter in order to determine if Calvin intended to resist arrest. When the ranger pointed his flashlight at Calvin's chest, Calvin said: "'Get that F-ing light out of my face.'" *State v. Calvin*, 176 Wn. App. 1, 8 (2013). When read his rights, Calvin called the ranger: "'ranger dick.'" *State v. Calvin*, 176 Wn. App. 1, 9 (2013). On appeal, Donald Calvin argued that the State failed to establish intent to resist a law enforcement officer, an element of the crime of resisting arrest. After reviewing the entirety of the evidence, including Calvin's remarks, this court disagreed.

In *State v. Ware*, 111 Wn. App. 738, 46 P.3d 280 (2002), the juvenile court considered Mojolene Ware's statement to the police indicating she would "not be taken" as helping to establish her intent to resist arrest. *State v. Ware*, 111 Wn. App. at 745. If the State may utilize the accused's comments against him or her to show a guilty state of

9

mind, the accused should receive the reciprocal opportunity to show an innocent state of mind.

The court's majority posits that the dissent fails to explain how Darnai Vaile's recorded statement is relevant if it is not true. The dissent has already met this contention. To repeat, Vaile's exclamation expressed his intent to do nothing other than to place his arm in the requested location. He expressed this intention regardless of whether his comment of holding his arm in place was accurate. It showed his desire to cooperate even if law enforcement obstructions to his bodily movements prevented his cooperation.

Darnai Vaile's recorded statement holds relevance for a second reason beyond its germaneness to Darnai Vaile's intent. During the questioning of Deputy Michael Vicini, the State's attorney asked Vicini if he heard Vaile saying anything. Vicini answered in the negative. Vicini knelt next to Vaile, while the operator of the camera stood farther away. If the camera captured Vaile's comments, Vicini should have also. Sheriff deputies testified that Vaile took no steps to cooperate. Vaile is entitled to rebut testimony from the officers by playing a recording of his speaking words of cooperation.

During the questioning of Deputy Michael Vicini by the prosecutor, Vicini also testified that, when he commanded Darnai Vaile to sit on the curb, Vaile exclaimed: "'I want to tell my side!'" RP at 309. Later during the questioning, Vicini added that Vaile stated: "'I have a knife.'" RP at 317. The State should not be free to pick and choose only those comments that purportedly show Vaile's state of mind consistent with defying

10

officer commands, while excluding remarks showing submittal to law enforcement authority.

The majority refuses to follow the teaching of Washington case law and provides no cases contrary to those cited by this dissent. The majority instead responds: "It still qualifies as hearsay" as if its ruling makes it so. (Majority opinion, p. 14).

This court reviews the trial court's evidentiary rulings for abuse of discretion. *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). An abuse of discretion is present on a showing that the exercise of discretion was manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). A decision is based on untenable grounds or made for untenable reasons if it was reached by applying the wrong legal standard. *State v. Horn*, 3 Wn. App. 2d 302, 312, 415 P.3d 1225 (2018). I conclude the trial court abused discretion by failing to apply the correct legal standard with regard to state of mind comments being nonhearsay when the State charged Darnai Vaile with an intentional crime. The trial court also failed to recognize the recording's significance in impeaching officer testimony. Finally, I would also rule that Darnai Vaile's recorded exclamation fell within the present sense impression exception to the hearsay rule such that it could be entered for the truth of the matter asserted.

The trial court, although refusing to play the audio, allowed Darnai Vaile to testify to his comments uttered on his arrest. An oddity arises from this ruling. For purposes of Vaile testifying from the witness stand as to his exclamation, the trial court either did not

11

adjudge those comments to be hearsay or the court determined that a hearsay exception applied. But the trial court refused the playing of those captured comments on a video. In short, the trial court permitted testimony inside the courtroom as to what was said outside the courtroom but refused to permit the jury to hear a sound recording of what Vaile precisely said outside the courtroom.

If the comments of Darnai Vaile captured in the recording constituted inadmissible hearsay, the trial court should have also precluded Vaile's testimony quoting his comments during the arrest. Conversely, if the out-of-court statements were admissible, the court should have allowed the playing of the audio. Indeed, the best evidence rule required the playing of the audio. If a party asserts that the language of a document holds relevance to a proceeding, the law wishes for the document to be introduced as an exhibit or a witness to read the document into the record rather than a witness testifying to his or her possible hazy memory of the language in the document. So too, if comments made during an event are relevant and admissible, the law wants the jury to hear those exact comments, if a sound recording exists, rather than a witness guessing as to what was said. This analysis also applies to the trial court's prevention of playing the audio recording of Patricia Murray's excited statement, but allowing her to testify to her comments.

The best evidence rule extends to sound recordings. ER 1001 reads, in pertinent part:

> For purposes of this article the following definitions are applicable:
> (a) Writings and Recordings. "Writings" and "recordings" consist of letters, words, *sounds*, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic

impulse, mechanical or *electronic recording*, or other form of data
compilation.

(Emphasis added.) (Boldface omitted.) The meat of the best evidence rule, ER 1002,

declares:

> To prove the content of a writing, recording, or photograph, the
> original writing, recording, or photograph is required, except as otherwise
> provided in these rules or by rules adopted by the Supreme Court of this
> state or by statute.

Numerous Washington decisions recognize the utility of playing sound recordings

to the jury when words spoken are relevant to a charged crime. *State v. Scherf*, 192

Wn.2d 350, 386, 429 P.3d 776 (2018); *State v. Caliguri*, 99 Wn.2d 501, 506, 664 P.2d

466 (1983); *State v. Frazier*, 99 Wn.2d 180, 187, 661 P.2d 126 (1983); *State v. Clapp*, 67

Wn. App. 263, 272, 834 P.2d 1101 (1992); *State v. Howland*, 66 Wn. App. 586, 596-97,

832 P.2d 1339 (1992). In *State v. Frazier*, the Supreme Court approved of the trial

court's admission into evidence of the tape-recorded statement Robert Frazier gave to a

police detective and the trial court's permission for the jury's playing of the recording in

the jury room. In *State v. Clapp*, this court recognized that the best evidence rule

demanded the playing of the wire recording of Marvin Clapp's solicitation of murder,

although the jury could also review a transcript during the playing of the audio.

### Patricia Murray Comments

I move to an analysis of Patricia Murray's recorded comments demanding that the

sheriff deputies cease their assault on Darnai Vaile because he is kind and gentle. The

trial court reasoned that the excited utterance hearsay exception did not apply because

Murray activated her phone camera and because her capacity to operate the camera to record the interaction between Vaile and law enforcement officers necessarily meant that she was not under stress or excitement. I conclude that the trial court abused its discretion by applying an incorrect legal standard. The court should have allowed the jury to hear Murray's entreaty on behalf of Vaile, in addition to Vaile's pleas.

The excited utterance exception, also known as the spontaneous declaration exemption, permits the admission of a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The proponent of the evidence must satisfy three closely connected elements: (1) a startling event or condition occurred, (2) the declarant uttered the statement while under the stress or excitement caused by the startling event or condition, and (3) the statement related to the startling event or condition. *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

Like many hearsay exceptions, the excited utterance rule assumes that statements falling within its ambit are inherently trustworthy. The declarant's spontaneous response to an external shock prevents her from reflecting on and controlling any resulting utterances. *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992). The startling circumstances overcome the speaker's ability to consciously fabricate. *State v. Dixon*, 37 Wn. App. 867, 872, 684 P.2d 725 (1984). Nevertheless, the proponent of the statement need not establish with other evidence the veracity of the excited utterance.

The statement in question need not be made simultaneously with the event such that some fluctuation in the time element is allowable. *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969). Also, the statement need not be made completely spontaneously, for under proper circumstances responses to questions may be admitted. *Johnston v. Ohls*, 76 Wn.2d 398, 406 (1969); *Robbins v. Greene*, 43 Wn.2d 315, 261 P.2d 83 (1953). Thus, limited reflection by the declarant does not prevent admissibility.

In *State v. Rodriquez*, 187 Wn. App. 922, 352 P.3d 200 (2015), the State played for the jury Lori Hendon's 911 call to report her having been choked by Peter Rodriguez. After the assault, Hendon fled her home with her daughter and hid in bushes while calling 911. This court held that the trial court did not abuse its discretion when admitting the recording as an exhibit.

I recognize this court, in *State v. Rodriquez*, affirmed the trial court's exercise of discretion rather than ruling that the trial court would have abused its discretion if it refused the playing of the 911 recording. Nevertheless, the decision illustrates that the victim's possession of the steadiness of mind to hide in bushes and the stability of hands to dial 911 on a cellphone did not prevent the call from being an excited utterance. So too, Patricia Murray's ability to press two buttons on her cellphone to record a distressing event should not remove contemporaneous comments from the excited utterance exemption to the hearsay rule.

The State does not argue that an intentional recording precludes a finding of an excited utterance. The State cites no decision wherein a reviewing court rejected the

15

excited utterance exception and upheld the exclusion of an audio recording based on the person recording the audio having the presence of mind to do so.

Patricia Murray testified to the startling nature of the attack on Darnai Vaile and the fright she experienced. Her voice on the recording confirms the excited nature of her utterance.

On appeal, the State contends Patricia Murray's remarks of Darnai Vaile being kind and gentle constituted inappropriate character evidence as opposed to a statement of fact. Likewise, the majority rules that Murray's comment did not relate to events transpiring, but to Murray's opinion of Vaile's nature.

Patricia Murray testified that she uttered to law enforcement officers: "[S]top, stop stop; he's gentle." RP at 384. The trial court sustained an objection to the "gentle" comment as character evidence. RP at 384. Nevertheless, when Julia Napier's counsel proceeded with a proffer of proof, the State withdrew the objection to the comment about being gentle. On appeal, the State forgets its concession, and this court's majority ignores the State's waiver.

After the State withdrew its objection, Patricia Murray averred that she based her "gentle" statement on her observation of Darnai Vaile's behavior, at the time of his arrest, as being "nonviolent" and "nonhostile," not on his character. RP at 385. He was surrendering when attacked. Murray testified:

> I was trying to get them to stop because it was so violent and they were hurting him.

RP at 385. Murray explained that her comments intended to express that Vaile was not resisting the arrest. Murray had never met Vaile before and knew nothing about Vaile's character. Thus, the testimony related to facts and did not form improper character evidence.

The State next contends that Patricia Murray's comments were prejudicial under ER 403. But the State did not assert this argument before the trial court.

The court majority affirms the trial court's preclusion of the playing of the recorded voice of Patricia Murray, but the majority fails to resolve the anomaly of the trial court allowing Murray to testify to her comments in the face of the best evidence rule. The majority also omits any discussion about removal of Murray's comments from the recording despite its permission granted to Darnai Vaile to play his remarks and his remarks overlapping the exclamatory comments of Murray.

Evidentiary Prejudice

Because of the reversal of Darnai Vaile's conviction for resisting arrest, this court's majority must have concluded that the muting of the video recording prejudiced Vaile, but the majority does not expressly so decree. I conclude the silencing of the audio prejudiced Vaile's defense. Although Vaile testified to the words he uttered while being arrested, the audio would have confirmed Vaile to be a credible witness because the recording confirmed his testimony. The audio also would have also buttressed his assertion of a desire to cooperate with law enforcement when being detained.

The audio recording would have also impeached the sheriff deputies' testimony that Vaile said nothing. I do not subscribe to a view that law enforcement officers usually fib, and I generally deem law enforcement officers brave heroes. Nevertheless,

> [s]ometimes cops lie. . . . And sometimes there's video proving that they lied.
> Video, even if it does not ultimately tell the entire story, can provide uniquely compelling evidence in a way testimony or physical evidence from the scene of a crime cannot. The spread of cellphone cameras has provided grim confirmation that police can be as dishonest as any other human being. That in itself raises certain dilemmas, such as how much weight to grant police statements and uncorroborated witness testimony.

Adam Serwer, *Deleting the Right to Record the Police*, The Atlantic (Oct. 6, 2022, 6:00 AM), https://www.theatlantic.com/ideas/archive/2022/10/arizona-restrict-video-recording-police-aclu-lawsuit/671650/?utm_source=email&utm_medium =social&utm_campaign=share.

I further conclude that Darnai Vaile suffered prejudice by the muting of Patricia Murray's excited utterance. Since Murray reported the conduct of Vaile to the police, she likely would have sided with action taken by the sheriff deputies. She is the rare purported victim who came to the defense of her accused because of the strong tactics of the officers. Her excited utterance, if heard on a contemporaneous recording, would confirm that Vaile did not seek to resist.

### Racial Bias

> This court has stated, unequivocally, that we owe a duty to increase access to justice, reduce and eradicate racism and prejudice, and continue to develop our legal system into one that serves the ends of justice. Recognizing that a verdict affected by racism violates fundamental concepts of fairness and equal justice under law, we recently held in a

18

> criminal case that race-based prosecutorial misconduct can never be "harmless error.". . . Racism is endemic, and its harms are not confined to any place, matter, or issue. . . . Whether explicit or implicit, purposeful or unconscious, racial bias has no place in a system of justice. If racial bias is a factor in the decision of a judge or jury, that decision does not achieve substantial justice, and it must be reversed.

*Henderson v. Thompson*, 200 Wn.2d 417, 421-22, 518 P.3d 1011 (2022) (internal citations omitted) (footnote omitted).

In the wake of the murder of George Floyd, the Washington Supreme Court, in a June 4, 2020 open letter to the Washington State judiciary and legal community, recognized persistent and systemic injustice that degrades and devalues Black lives. The court lamented racialized policing and overrepresentation of Black Americans in every stage of our criminal justice system. The court implored the Washington judiciary to summon the will to end this injustice by carefully reflecting on actions we take. According to the state Supreme Court, judges must not limit themselves to "tradition and the way things have 'always' been." Open Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), http://www.courts.wa.gov/content/ publicUpload/ Supreme%20Court%20News/Judiciary%20Legal%20Community %20SIGNED%20060420.pdf.

As part of his appeal, Darnai Vaile protests the inequity contaminating his arrest and his manhandling by sheriff deputies. Vaile emphasizes his being African-American, the complaining witness being Caucasian, and all sheriff deputies at the scene being white. Vaile highlights his fear of being detained by officers because of the long history of deadly police encounters with Black men.

19

In light of the Washington Supreme Court's challenge to judges, Darnai Vaile's claim of discrimination merits this court's attention. Racial bias tainted this case well beyond Vaile's arrest. It began with Patricia Murray's 911 call, continued through the arrival of law enforcement officers at Peking Palace, persisted during the detainment of Vaile, influenced the charges brought against Vaile, motivated evidentiary arguments forwarded by the State, poisoned the closing argument of the prosecution, and extends to the positions taken by the State in this appeal. The treatment of Vaile depicts a far range of racially motivated conduct and fulfills numerous racist tropes.

The racial cancer infecting Darnai Vaile's case began with his inopportune kiss of Patricia Murray. No one testified as to the location on Murray's body where Vaile kissed Murray. Murray did not testify to any physical harm. Admittedly Vaile used terrible judgment when he kissed a white woman in a bar, but this mistake did not justify the inevitable consequences that thereafter transpired. In addition to African-American parents giving "the talk" to their children about frequent detainments by law enforcement officers, the parents give "the talk" to sons not to publicly express attraction to a white woman stranger. With the kiss, Vaile was doomed. He would suffer violence. He would inevitably land in jail and be entangled in the criminal justice system for years.

Instead of reporting Darnai Vaile to the restaurant managers and asking that he be removed from Peking Palace, Patricia Murray phoned law enforcement. Some white women view police as private security guards and protectors ready to perform their bidding. We pejoratively label these women with the moniker "Karen." Videos abound

of Karens asking for assistance because of the innocuous presence of a Black man.
Megan Armstrong, From Lynching to Central Park Karen: *How White Women Weaponize White Womanhood*, 32 HASTINGS WOMEN'S L.J. 27, 32-42 (2021). When calling 911, Murray likened the kiss to a gang rape. History informs of numerous instances of white women claiming rape when innocently touched by a Black man. Brutal consequences to the male follow.

The arrival of six to eight Spokane County Sheriff's Office patrol cars occupied by an unknown total of deputies for a nonconsenting kiss was overkill, but represented a typical response to an accusation against a person of color. Also, as part of a predictable response, law enforcement officers will instinctively view a Black man that is perambulating as walking aggressively and appearing angry. Frank Rudy Cooper, *Race and Essentialism in Gloria Steinem*, 11 Berkeley J. Afr.-Am. L. & Pol'y 36, 46 (2009). Law enforcement officers will contend the African-American acted combatively in order to excuse vicious force. Then at trial, the State's attorney will summon for the jury the stereotypical view of a Black person as not worthy of credibility because of his or her being confrontational. *Henderson v. Thompson*, 200 Wn.2d 417, 424 (2022).

Contrary to the testimony of the Spokane County sheriff deputies about Darnai Vaile's conduct, no bystander confirmed the sheriff deputies' description of Vaile as walking aggressively or appearing angry. All witnesses averred that Vaile walked as if surrendering to the deputies.

The Spokane County sheriff deputies treated Darnai Vaile as if he committed a major crime such as rape, not an unwanted kiss. Police use force against African-American men for even minor offenses or when no offense transpired. *Resisting Arrest and Racism–The Crime of "Disrespect*," 85 UMKC L. Rev. 625, 626 (2017). Sheriff deputies deemed Vaile to fit the stereotype of an African-American suspect. He was not a human being with which to reason, but a grave threat to fear and subdue, if not conquer. Despite Vaile never engaging in violent behavior, officers reflexively adjudged Vaile as jeopardizing not only their physical safety, but the security of the crowd in the Peking Palace parking lot. No officer testified to why they needed to manhandle Vaile other than his insistence on telling his story rather than sitting down and his continuing to walk toward the officers.

The arresting law enforcement officers claimed Darnai Vaile formed a clenched fist and waived this clenched hand from his side to above his head. Yet, no bystander corroborated the claim of a clinched fist. Bystanders testified that Vaile held his hands high as if surrendering. Regardless, the clenched fist serves as a symbol of African-American rebelliousness and assertion of power against white control. Testimony from officers of the clenched fist posed an opportunity for the State to insert the stereotype of African-American Vaile mutinying against government authority. Jeremy Helligar, *How the Clenched Fist Became a Black Power Symbol*, Reader's Digest, July 21, 2021.

Darnai Vaile testified that, once on the ground, he attempted to cooperate but could not get his hands out from underneath him because an officer sat on him. Darnai

Vaile's pleas to the officers suggest that his attempt to comply with one officer's orders interfered with the instructions given by one or more others. When two or more officers arrest a suspect, the officers, in the excitement of the scrum, often shout contradictory orders to the arrestee. Since the suspect cannot obey all inconsistent commands, some of the officers decide that the suspect resists arrest and those officers impose further violence on him. Memphis police officers shouted simultaneously inconsistent orders to Tyre Nichols, who officers later killed. Robin Stein, Alexander Cardia, and Natalie Reneau, *71 Commands in 13 Minutes: Officers Gave Tyre Nichols Impossible Orders*, New York Times, January 29, 2023.

The Spokane County sheriff deputies' attack on Darnai Vaile is too often standard police procedure. In fact, one knowledgeable of encounters between African-American males and law enforcement officers would express surprise that Vaile survived the encounter without serious injury. Many Black Americans are not so lucky. Katie Wedell, Cara Kelly, Camille McManus and Christine Fernando, *George Floyd is not alone. "I can't breathe" uttered by dozens in fatal police holds across U.S.,* USA Today, June 25, 2020.

The Washington Supreme Court open letter of June 2020, mass protests, and momentary corporate support for Black Lives Matter followed the murder of George Floyd on May 25, 2020. A friend then commented that Floyd's death would finally bring needed and overdue change to a racist criminal justice system. I demurred. I wish I was wrong. The deaths continue, if not increase. *US police killings hit record high in 2022,*

23

Afro News, January 9, 2023; Rick Rojas and Jessica Jaglois, *Five Officers Charged With Murder in Memphis Police Killing*, New York Times, January 26, 2023; Robert Garrova,*"He Just Needed Help"–Family of Takar Smith Will Sue After Fatal LAPD Shooting*, LAist, January 13, 2023; Lauren Abunassar, *Council Eyes Renewed LAPD Reform After 3 Arrest Deaths in 25 hours*, Los Angeles Magazine, January 17, 2023.

Racism also infected the charges filed by the State of Washington against Darnai Vaile. The State prosecuted Vaile for assaulting two law enforcement officers, despite no officer testifying that Vaile threatened force or struck an officer. No officer testified to any injury suffered from the action of Vaile. The State introduced pictures of Darnai Vaile's injuries, but no photographs of alleged officer injuries.

The State rested its two charges of assault on the theory that the sheriff deputies reasonably feared for their safety because of the presence of a knife, the excitability of Darnai Vaile, and the lack of his cooperation. Nevertheless, Vaile possessed the right to carry a knife. In order to protect himself, Vaile volunteered the presence of the knife in his pocket and, despite restraints, threw the knife to the ground. The deputies' professed fear of Vaile because of his excited nature and his purported refusal to cooperate caters to the stereotype of the angry Black man. Not only was Vaile an angry black man, but he was a large, angry Black man. Under the State's theory of the case, any man lawfully carrying a knife and coming near a law enforcement officer could be convicted of assault. Any man of color who approaches too close to a law enforcement officer would also be guilty of the crime because of the officer's fear for his or her safety.

24

In addition to the two charges of assault of law enforcement officers, the State of Washington charged Darnai Vaile with not one, but two, counts of resisting arrest as if he was the subject of multiple arrests. Overcharging a Black man for rebelliousness is common. But the prosecution must not overcharge to obtain a guilty plea. RCW 9.94A.411(2)(a)(ii). Overcharging includes charging additional counts of the same crime. RCW 9.94A.411(2)(a)(ii).

Police use the charge of resisting arrest as a form of racial oppression rather than to keep communities safe. Scott Holmes, *Resisting Arrest and Racism–The Crime of "Disrespect,"* 85 UMKC L. Rev. 625, 626 (2017).

> Then when the black person protests or resists the illegitimate use of authority, the officer punishes the black person with a forcible full custodial arrest.

*Resisting Arrest and Racism–The Crime of "Disrespect,"* 85 UMKC L. Rev. 625, 627-28 (2017). Despite no crime having been committed, police demand that the Black person be charged with resisting arrest. *Resisting Arrest and Racism–The Crime of "Disrespect,"* 85 UMKC L. Rev. 625, 628 (2017). Resisting charges function as a means of targeting people of color who "disrespect" authority. *Resisting Arrest and Racism– The Crime of "Disrespect,"* 85 UMKC L. Rev. 625, 628 (2017).

A *New York Times* article on police misconduct in Greensboro, North Carolina, described the charge of "resisting, delaying, and obstructing a public officer," a "catch all charge." Sharon LaFranier & Andrew W. Lehren, *The Disproportionate Risks of Driving While Black*, New York Times, October 24, 2015. According to one attorney interviewed

for the article, if the Black detainee "does anything but be completely submissive and cower, then you get the classic countercharge by the officer that there was resistance, or disorderly conduct or public intoxication." Sharon LaFranier & Andrew W. Lehren, *The Disproportionate Risks of Driving While Black*, New York Times, October 24, 2015.

> Just as officers reflexively resort to arrest immediately upon noncompliance with their orders, whether lawful or not, they are quick to overreact to challenges and verbal slights. These incidents—sometimes called 'contempt of cop' cases—are propelled by officers' belief that arrest is an appropriate response to disrespect. These arrests are typically charged as a Failure to Comply, Disorderly Conduct, Interference with Officer, or Resisting Arrest.

*Resisting Arrest and Racism–The Crime of "Disrespect,"* 85 UMKC L. Rev. 625, 631 (2017).

According to a study done by law professor Scott Holmes, between 2009 and 2015 in Greensboro, North Carolina, police charged 836 blacks with *only* the charge of "resisting arrest" and 209 whites with the same charge. Sharon LaFranier & Andrew W. Lehren, *The Disproportionate Risks of Driving While Black*, New York Times, October 24, 2015. Over the course of eighteen months, ninety percent of the one hundred ninety-six resisting charges in Durham County, North Carolina, were issued to people of color. Only nineteen of the resisting charges were issued to people identified in the court files as "white." *Resisting Arrest and Racism–The Crime of "Disrespect*, 85 UMKC L. Rev. 625, 631 (2017). A man of color resists arrests if he so much as twitches when being detained by law enforcement.

Darnai Vaile's encounter with sheriff deputies followed this pattern. Vaile disrespected authority when insisting that the deputies promptly hear his side of the story. The State did not charge him with any crime arising from his kissing of Patricia Murray, but only crimes incident to his interaction with law enforcement officers.

The discriminatory treatment of Darnai Vaile continued during trial with an imbalanced application of evidence rules and offensive and misleading State arguments. Jurors typically side with law enforcement officers, especially when the accused is a member of a racial minority. Anna Roberts, *Asymmetry as Fairness: Reversing a Peremptory Trend*, 92 WASH. U. L. REV. 1503, 1529 (2015). Data demonstrates that participants in the criminal justice system render decisions based on race despite their protests otherwise. Praatika Prasad, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response*, 86 FORDHAM L. REV. 3091, 3095-96 (2018). Jurors reach more lenient judgments of same race defendants and harsher judgments of other race defendants. Jennifer S. Hunt, *Race, Ethnicity, and Culture in Jury Decision Making*, 11 ANN. REV. L. & SOC. SCI. 269, 271 (2015). The State undermines the accused's right to a fair trial and the presumption of innocence when it compounds the accused's difficulty in defending himself by unfair treatment of evidence and false factual arguments to the jury.

The majority opinion omits important evidence admitted, State evidentiary arguments, trial court evidentiary rulings, and summation remarks that harmed Darnai Vaile. During a motion in limine to exclude bystander statements, the State asserted, in

part, that the trial court should not allow introduction of the statements because the declarants disliked law enforcement officers. According to the State, such witnesses lacked credibility. The prosecuting attorney intoned:

> MR. NAGY [the State's attorney]: Your Honor, these come from defense witnesses; that's my concern. My concern is to be an exception; the Court has to find these are statements that have credibility; they're credible statements. They have—of course, I don't have my books here because I don't know where they are, but there has to be—the Court has to believe that the statements have validity, and these are self-serving statements that defense counsel witnesses want to put forward.
> . . . .
> Again, *these are people that didn't like the police*; the police were concerned about the safety of everyone, everyone was intoxicated. Your Honor, frankly, these statements reek, and they're—the credibility of these statements, I question them significantly.

RP at 153-54 (emphasis added).

Even assuming some witnesses disliked the police, no rule automatically bars, or impulsively taints, the testimony of a witness or statements of a bystander that holds animosity to officers or loathes the conduct of law enforcement. This attempt to bar exclusion of unfavorable testimony signals an arrogant and biased State notion that only their witnesses hold credibility.

The record does not show the race of trial witnesses, but their testimony corroborated the testimony of Darnai Vaile. The State explicitly sought to exclude testimony favorable to an African-American man and implicitly attacked testimony from most African-Americans. Polls show a majority of Black Americans distrust law enforcement, while a substantial majority of whites hold confidence in police officers. Laura Santhanam, *Two-thirds of Black Americans don't trust the police to treat them*

28

*equally. Most white Americans do*, PBS Newshour, June 5, 2020; Jacob Sullum, *Most*

*Americans Don't Trust Cops Much, a New Gallup Poll Reveals*, Reason, August 13,

2020. Dislike for law enforcement likely echoes one's distrust for law enforcement. The

State's theory of witness credibility would mute most African-American voices inside the

courtroom.

The State successfully gained permission from the trial court for law enforcement

officers to testify to out-of-court statements of others on the basis that the statements

impacted the respective sheriff deputies' state of mind. For example, Deputy Griffin

Criswell declared to the jury:

> A Deputy Hilton and Vicini had arrived prior to me by a couple of
> minutes. They asked for additional units that were responding to step it up.
> MR. KIDD [Darnai Vaile's counsel]: Objection, hearsay, Your
> Honor.
> MR. NAGY [the State's attorney]: Goes to state of mind, Your
> Honor.
> THE COURT: Overruled.
> Q (By Mr. Nagy) Go ahead, sir.
> A Okay. They advised via radio that they requested an expedited
> response. And they said there was a, quote-unquote, troublemaker. This
> was all broadcast over the air; that was the words that were used.

RP at 399.

Out-of-court declarations may be admitted to demonstrate an officer's state of

mind only if his or her state of mind is relevant to a material issue in the case; otherwise,

such declarations are hearsay. *State v. Hudlow*, 182 Wn. App. 266, 278, 331 P.3d 90

(2014); *State v. Aaron*, 57 Wn. App. 277, 279-81, 787 P.2d 949 (1990). The State never

explained why hearsay testimony allegedly impacting an officer's state of mind bore

relevance to the charges of third degree assault and resisting arrest. The State never explained why law enforcement officers could testify to out-of-court statements in order to establish their state of mind, but Darnai Vaile could not introduce his comments surrounding the arrest in order to show his state of mind. As already analyzed, Vaile's state of mind formed a critical element of the crime charged.

A prosecuting attorney represents the people and presumptively acts with impartiality in the interest of justice. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011); *State v. Fisher*, 165 Wn.2d 727, 746, 202 P.3d 937 (2009). Defendants are among the people the prosecutor represents. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Prosecutors have a duty to the defendant to uphold their right to a fair trial. *State v. Monday*, 171 Wn.2d 667, 676 (2011). The prosecution must also administer evenhanded justice. *People v. Robles*, 174 A.D.3d 653, 655, 105 N.Y.S.3d 111, (2019). The duty to accord the accused a fair trial extends to closely observing evidence rules. *State v. Hild*, 240 Iowa 1119, 1154, 39 N.W.2d 139, 159 (1949). Insisting on inconsistent application of evidence rules to the favor of the State does not afford a fair trial or execute evenhanded justice.

The trial court must administer evidence rules in an evenhanded manner. *Carson v. Fine*, 123 Wn.2d 206, 225, 867 P.2d 610 (1994) (addressing ER 403). A reviewing court must be vigilant in ensuring symmetrical application of evidence rules particularly when the inconsistent application continues injustices imposed on people of color by the American judicial system. The court majority's ruling rejecting the nonhearsay nature of

30

Patricia Murray's recording of Darnai Vaile's utterance conceals the unequal application of evidence rules advocated by the State. The majority's ruling frees the State to once again advocate for discriminatory evidence rulings on retrial.

During the trial, the State also introduced, through testimony of law enforcement officers, out-of-court remarks uttered by bystanders in the Peking Palace parking lot when those out-of-court statements benefited the State. For example, during the testimony of Sheriff Deputy Clay Hilton, the trial court allowed Hilton to testify to a comment made by a bystander because of the excited utterance character of the comment:

> Q What was the gentleman's demeanor as he walked away from you?
> A He made a statement—
> MR. KIDD [defense counsel]: Objection.
> Q (By Mr. Nagy [the State's attorney]) First is demeanor. What was his demeanor as he walked away from you?
> A He was kind of panicked.
> Q Did he say anything when he was kind of panicked?
> A Yes.
> Q What did he say?
> MR. KIDD: Objection, hearsay.
> MS. CADY [counsel for co-defendant]: Objection.
> MR. NAGY: Excited utterance, Your Honor.
> THE COURT: Sustained at this time; no foundation.
> Q (By Mr. Nagy) Why did you say he was panicked? Could you describe his expression on his face?
> A He had looked like he was shocked that he saw something that he didn't like, and based on his demeanor, I turned around, and I saw what ended up being Mr. Vaile walking out of the parking lot from the east.
> Q Sir, how quickly did that gentleman move in going towards Mr. Vaile?
> A Immediately.
> Q Sir, based on that, can you tell us what did he say as he left?
> MR. KIDD: Objection, hearsay.
> THE COURT: Overruled.
> THE WITNESS: He said I have to stop him.

31

RP at 242-43.

The State, despite arguing this one unidentified witness's comments qualified under the excited utterance hearsay exception, refused and continues to refuse to agree that Patricia Murray, when upset and startled on seeing law enforcement officers attack a gentle man, could testify under the exception. The State denied and continues to deny the admissibility of out-of-court statements by Darnai Vaile as being excited utterances despite Vaile's terror at being detained by law enforcement officers.

During closing, the State's attorney intoned:

> You heard from Deputy Criswell. He also responded to the scene. When he got to the scene, he testified he didn't see any of the preliminary activities, but he saw the deputies, one on each arm, trying to control Mr. Vaile. He saw the knife that was lying on the ground. He testified that it looked to him as if Mr. Vaile was tossing the deputies around like they were rag dolls.

RP at 678. Sheriff Deputy Griffin Criswell never testified to any violence by Darnai Vaile directed at the officers, let alone that he viewed Vaile tossing deputies like rag dolls. The closing argument's picture of Vaile simultaneously throwing two law enforcement officers as if they were Raggedy Ann dolls catered to a stereotype of African-American men as violent brutes bred to be large and strong. The prosecuting attorney's egregious fabrication removes any doubt that racism infected this prosecution and ends any reluctance to pen this jeremiad.

The State's attorney never explicitly mentioned Darnai Vaile's ethnicity. But not all appeals to racial prejudice are blatant. *State v. Monday*, 171 Wn.2d 667, 678 (2011).

As noted in *Monday*, a careful word here and there can trigger racial bias. A prosecutor often activates biases, without expressly asserting the race card, through the use of coded language or words or phrases that play on race and white Americans' negative views of Black Americans. *State v. Bagby*, 200 Wn.2d 777, 794, 522 P.3d 982 (2023). Appeal to racial bias may be more effective with subtle references. Encrypted utterances allow the speaker to appeal to prejudice and then deny that he or she intended any racist malignment. *Henderson v. Thompson*, 200 Wn.2d 417, 432 (2022). Courts must be vigilant of conduct that appears to appeal to racial or ethnic bias even when not expressly referencing race or ethnicity. *State v. Zamora*, 199 Wn.2d 698, 714, 512 P.3d 512 (2022).

Prosecutors refer to a Black defendant's actions, rather than the defendant himself, as animalistic, brutish, and impulsive in order to evoke, in the minds of jurors, mental models of Black people. Ryan Patrick Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis*, 11 MICH. J. RACE & L. 325, 349 (2006). Prosecutors invoke the stereotype of a strong, Black man while telling the jury the prosecution is not about race. Mary Nicol Bowman, *Confronting Racist Prosecutorial Rhetoric at Trial*, 71 Case W. L. Rev. 39, 70 (2020). Prosecutors employ tactics to distinguish a Black American defendant from characteristics of the white jury in order to convey the thought that the defendant deserves no sympathy. *State v. Bagby*, 200 Wn.2d 777, 794-95 (2023).

The prosecuting attorney's labeling of Darnai Vaile as a dangerous Black man differentiated Vaile from the Spokane white community and likely from members of the jury. Since Cicero, rhetoric has employed the technique of "othering" others as someone outside the moral community in order to induce a negative emotional response to a category of other people. Ryan Patrick Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis*, 11 MICH. J. RACE & L. 325, 335 (2006). Demeaning references to racial groups invite jurors to view a defendant as coming from a different community than themselves. *State v. Watkins*, 526 N.W.2d 638, 641 (Minn. Ct. App.1995).

One can argue that the conduct and remarks of the State's attorney did not influence the jury because the jury acquitted Darnai Vaile on the assault charges. But the jury could have acquitted him on all charges without the misleading and racist comments. Because the jury presumably believed the testimony of Vaile, Patricia Murray, and other witnesses that Vaile did not assault the officers, one must wonder why the jury did not believe testimony that Vaile submitted to detention. The evidence of resisting arrest is weak when considering the jury acquitted Vaile on the charges of assault. The result suggests a compromise verdict by the jury because of racial bias against Vaile.

Studies show that simple racial cues affect the way a juror evaluates evidence. *State v. Bagby*, 200 Wn.2d 777, 795 (2023). Racial bias affects a juror's decision without his or her awareness. *Henderson v. Thompson*, 200 Wn.2d 417, 433 (2022).

The State's attorney would deny any racial motivation for his comments. Nevertheless, when determining whether the accused received a fair trial, the Washington Supreme Court does not ask whether the State's attorney intentionally appealed to racism. *State v. Bagby*, 200 Wn.2d 777, 791 (2023). No one admits to racism and will genuinely resort to race neutral reasons when explaining biased comments. *State v. Bagby*, 200 Wn.2d 777, 791 (2023). A court should focus on the racist rhetoric, not racist prosecutors. A court must focus on the language not the moral culpability of the State's attorney. Mary Nicol Bowman, *Confronting Racist Prosecutorial Rhetoric at Trial*, 71 Case W. L. Rev. 39, 46 (2020). The Washington Supreme Court has instructed courts not to base decisions on the subjective intent of government actors, but on the viewpoint of an objective observer who has studied the history of persistent racism in America and who recognizes how race discrimination impacts the justice system in nonexplicit, implicit, and unstated ways. *Henderson v. Thompson*, 200 Wn.2d 417, 422 (2022); *State v. Jefferson*, 192 Wn.2d 225, 249, 429 P.3d 467 (2018) (plurality opinion).

The United States Constitution prohibits racially based prosecutorial arguments. *McClesky v. Kemp*, 481 U.S. 279, 309 n.30, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). A plea to the jury based on color and race, no matter how artfully phrased, constitutes an appeal to prejudice and passion that violates every basic concept of fair trial. *People v. Hearns*, 18 A.D.2d 922, 923, 238 N.Y.S.2d 173 (1963). Exploitation of race in a criminal trial is as offensive to constitutional principles as the enforced segregation of races in the courtroom. *Johnson v. Virginia*, 373 U.S. 61, 83 S. Ct. 1053, 10 L. Ed. 2d

195 (1963). Race based prosecutorial misconduct can never be harmless error. *Henderson v. Thompson*, 200 Wn.2d 417, 421 (2022).

## Dismissal as Remedy

This court reverses and remands for a new trial the conviction for resisting arrest on evidentiary grounds rather than for improper racist comments. Since the undisputed facts, including the trial transcript, demonstrate racial prejudice blighting the prosecution of Darnai Vaile, I would also reverse the conviction on the basis of the State inserting racial stereotypes into the trial. But I would go further. I would ask the parties to submit briefing on whether the case should be dismissed for government misconduct. I would direct counsel to include, in a discussion of government misconduct, the conduct of law enforcement at the Peking Palace, the charging of Vaile with resisting arrest under the circumstances when he was not charged with any other crime such that law enforcement lacked cause to arrest, the overcharging of counts of resisting arrest, the uneven advocacy of evidentiary rules by the State, the racial innuendoes employed by the prosecutor at trial, and the cumulative effect of the numerous instances of State misconduct.

Washington law affords two avenues for dismissing prosecutions for government misconduct: (1) court rule, and (2) constitutional fiat. *State v. Solomon*, 3 Wn. App. 2d 895, 908-10, 419 P.3d 436 (2018). A court rule, CrR 8.3(b), reads:

> On Motion of Court. The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

(Boldface omitted.)  Under the due process clause, the court may dismiss a prosecution for outrageous government conduct.  *State v. Myers*, 102 Wn.2d 548, 551, 689 P.2d 38 (1984).

The court rule appears to allow dismissal on lesser grounds, since it encompasses mismanagement and mismanagement rarely embraces outrageous conduct.  CrR 8.3(b) assumes government conduct after charging and within the context of the prosecution. The due process clause generally entails law enforcement conduct leading to the prosecution.

A defendant must make two showings to justify dismissal under CrR 8.3(b): (1) arbitrary action or governmental misconduct, and (2) prejudice affecting the defendant's right to a fair trial.  *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003); *State v. Barry*, 184 Wn. App. 790, 797, 339 P.3d 200 (2014).  This rule allows a court to dismiss a criminal prosecution in the furtherance of justice.  *State v. Whitney*, 96 Wn.2d 578, 637 P.2d 956 (1981).  Government misconduct can be something as basic as simple mismanagement.  *State v. Michielli*, 132 Wn.2d 229, 239, 937 P.2d 587 (1997); *State v. Barry*, 184 Wn. App. 790, 797 (2014).  The conduct need not be evil or dishonest.  *State v. Laureano*, 101 Wn.2d 745, 762, 682 P.2d 889 (1984), *overruled on other grounds*, *State v. Brown*, 111 Wn.2d 124, 133, 761 P.2d 588 (1988); *State v. Kone*, 165 Wn. App. 420, 433, 266 P.3d 916 (2011).  The court rule seeks to ensure that one charged with crime is fairly treated.  *State v. Whitney*, 96 Wn.2d 578, 580 (1981).

Due process principles can bar the government from invoking the judicial process

when law enforcement officers acted outrageously. *United States v. Russell*, 411 U.S.

423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). A due process claim based on

outrageous conduct requires more than a mere demonstration of flagrant police conduct.

*State v. Myers*, 102 Wn.2d 548, 551 (1984). The conduct must be so shocking that it

violates fundamental fairness. *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996);

*State v. Solomon*, 3 Wn. App. 2d 895, 909 (2018). The conduct must also be repugnant

to a sense of justice. *State v. Lively*, 130 Wn.2d 1, 26 (1996). Dismissal based on

outrageous conduct is reserved for only the most egregious circumstances. *State v.

Pleasant*, 38 Wn. App. 78, 83, 684 P.2d 761 (1984). The defense of government

misconduct is nearly impossible to establish. *State v. Markwart*, 182 Wn. App. 335, 348,

329 P.3d 108. Whether the State has engaged in outrageous conduct is a matter of law,

not a question for the jury. *State v. Lively*, 130 Wn.2d 1, 19 (1996).

The Washington Supreme Court held conduct to be outrageous in one case

wherein an undercover officer developed a close relationship with a troubled woman.

*State v. Lively*, 130 Wn.2d 1 (1996). This court held conduct to be outrageous, in *State v.

Solomon*, 3 Wn. App. 2d 895 (2018), when law enforcement persistently solicited Joshua

Solomon to engage in sex with a fictitious minor.

A court may dismiss the charges on its own motion. *State v. Lewis*, 115 Wn.2d

294, 298, 797 P.2d 1141 (1990). An appellate court should neither weigh the underlying

facts nor resolve factual disputes when resolving an outrageous governmental misconduct claim. *State v. Valentine*, 132 Wn.2d 1, 23-24, 419 P.3d 436 (2018).

Dismissal of charges is an extraordinary remedy. *State v. Puapuaga*, 164 Wn.2d 515, 526, 192 P.3d 360 (2008); *State v. Barry*, 184 Wn. App. 790, 797 (2014). The remedy is available only when the State misconduct materially affected the rights of the accused to a fair trial and that prejudice cannot be remedied by granting a new trial. *State v. Laureano*, 101 Wn.2d 745, 762-63 (1984); *State v. Baker*, 78 Wn.2d 327, 332-33, 474 P.2d 254 (1970).

Unlike the facts behind other decisions, grounds for dismissal of charges against Darnai Vaile cover both police action and State action at the time of and after the charging decision. So, dismissal could invoke both due process principles and rules under CrR 8.3(b).

I recognize that no Washington case law supports dismissal solely for the conduct of the Spokane County sheriff deputies toward Darnai Vaile. Also, no Washington ruling supports dismissal of a prosecution solely as the result of one of the State's discreet acts when overcharging crimes, charging the crime of resisting arrest when not charging for any underlying crime, insisting on inconsistent application of evidentiary rules, or employing racist innuendoes during trial. Finally, if this court's majority would have issued correct rulings, any government misconduct in conducting the trial might be avoided at retrial. But the singular acts of misbehavior and mismanagement in Vaile's detainment and prosecution did not occur alone or in isolation. No other reported

39

decision entails such extended and cumulative misconduct based on racial bigotry and stereotypes.

The cumulative effect of all police and prosecution action may warrant dismissal. In *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013), the federal appeals court found that the government did not violate the due process clause by its conduct, but the court viewed the conduct cumulatively.

More importantly, past attempts by the Washington Supreme Court to end racism within the criminal justice system have not succeeded. Some prosecuting attorneys continue to employ dog whistles, and this appellate court refuses to condemn the prosecution's appeals to racial bias during trial. Removing racism from Washington's criminal justice system may demand dismissal of prosecutions infected by appeals to racial prejudice. As declared by the Supreme Court, as our understanding and recognition of implicit bias evolves, our procedures for addressing it must evolve as well. *State v. Behre*, 193 Wn.2d 647, 663, 444 P.3d 1172 (2019).

Racism continues to be endemic and its harms not confined to any place. *Henderson v. Thompson*, 200 Wn.2d 417, 421 (2022). Racial bias is a common and pervasive evil that causes systemic harm to the administration of justice. *State v. Behre*, 193 Wn.2d 647, 657 (2019). We owe a duty to reduce and eradicate racism and prejudice. *Henderson v. Thompson*, 200 Wn.2d 417, 421 (2022). Discrimination on the basis of race, odious in all respects, is especially pernicious in the administration of

justice. *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 223, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017).

I follow the dissent of Judge John Schultheis in *State v. Valentine*, 75 Wn. App. 611, 879 P.2d 313 (1994) in summoning supplemental briefing as authorized by RAP 12.1(b) and deciding the case on this basis. Short of this court agreeing to additional briefing, I would reverse the conviction and dismiss the charges.

Majority Critique of Dissent

I now respond to criticisms penned by this court's majority toward the dissent.

The court majority writes that the Washington Supreme Court's open letter of June 2020 did not solicit an individual court's quixotic quest to ferret for racism in discrete cases. In *State v. Bagby*, 200 Wn.2d 777, 797 (2023) and *Henderson v. Thompson*, 200 Wn.2d 417 (2022), the Supreme Court repudiated this narrow reading of the open letter. Even if the Washington Supreme Court had never authored a letter instructing courts to address racism, this court should willingly take all measures to end racism.

The court majority refuses to review the racial bigotry in Darnai Vaile's prosecution in part because Vaile did not explicitly include the word racism in any assignment of error. The court also refuses in part to confront the racism because its reversal of the conviction on other grounds purportedly moots the need to address whatever racism exudes from the prosecution. Three responses rejoin the majority's rationalizations for declining to confront racism.

First, the majority fails to comprehend how racism influences an entire proceeding, including the evidentiary issues that the majority addresses. Seemingly insignificant racist comments or isolated conduct inside a legal proceeding pollute the entire prosecution.

Second, as a result of the court's refusal to recognize and condemn the racism, the State, on retrial, will repeat advocacy of uneven application of evidence rules and employ racist tropes. The court majority's ruling allows the State to convict Darnai Vaile on retrial while again denying Vaile a fair trial. This court often addresses unnecessary issues because of the potential for repetition on remand for another trial. *State v. Gregory*, 158 Wn.2d 759, 800-01, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Williams*, 81 Wn. App. 738, 744, 916 P.2d 445 (1996).

Third, because of the racism, the dissent backs dismissal of the charges, not a retrial, or at least the exploration of a dismissal after further briefing from the parties. Thus, recognizing the State's racist prosecution makes a difference in the outcome of this appeal.

The majority of the court pans the dissent for wandering from the arguments asserted by Darnai Vaile. In so doing, the court cites only federal cases for the proposition that the court should not raise errors unassigned by the parties. *United States v. Sineneng-Smith*, ___ U.S. ___, 140 S. Ct. 1575, 1579, 206 L. Ed. 2d 866 (2020); *McNeil v. Wisconsin*, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991). But the

Federal Rules of Appellate Procedure lacks a provision similar to Washington's RAP

12.1(b).

RAP 12.1(b) declares:

> (b) Issues Raised by the Court. If the appellate court concludes that an issue which is not set forth in the briefs should be considered to properly decide a case, the court may notify the parties and give them an opportunity to present written argument on the issue raised by the court.

(Boldface omitted.) This court could, but refuses to, ask the parties to address the

prejudicial undertones and overtones in the prosecution of Darnai Vaile.

Pursuant to RAP 12.1(b), this court has repeatedly asked the parties to brief issues

not presented in the parties' appellate briefs. RAP 12.1(b) means exactly what it says:

this court may raise issues sua sponte and may rest its decision thereon. *Obert v.*

*Environmental Research & Development Corp.*, 112 Wn.2d 323, 333, 771 P.2d 340

(1989); *Alverado v. Washington Public Power Supply System*, 111 Wn.2d 424, 429, 759

P.2d 427 (1988); *Dalton M, LLC v. North Cascade Trust Services, Inc.*, 20 Wn. App. 2d

914, 942, 504 P.3d 834, *review granted sub nom. Dalton M, LLC v. U.S. Bank National*

*Association*, 200 Wn.2d 1016, 520 P.3d 969 (2022). Contrary to the two citations

forwarded by the majority, even federal courts frequently decide crucial issues that the

parties fail to present. *Silber v. United States*, 370 U.S. 717, 717-18, 82 S. Ct. 1287, 8 L.

Ed. 2d 798 (1962); *Boynton v. Commonwealth of Virginia*, 364 U.S. 454, 457, 81 S. Ct.

182, 5 L. Ed. 2d 206 (1960).

In *Dalton M, LLC v. North Cascade Trust Services, Inc.*, 20 Wn. App. 2d 914

(2022), this division of the Court of Appeals recently denied the prevailing party fees on

one ground but directed the parties to brief whether fees should be granted on a separate ground not raised by the winner. This court skews its priorities when it reaches out to ensure that the prevailing party in a civil suit receives an award of fees and costs, but refuses to address the virus of racial bigotry in a prosecution.

The majority opinion critiques the dissent as viewing the evidence in a light favorable to Darnai Vaile, the losing party. But in analyzing whether dismissal is warranted, this dissent considers the testimony of the law enforcement officers as verity despite none of the bystanders or the victim confirming the testimony. I agree, for purposes of this dissent, that Vaile walked briskly toward the officers, refused to immediately sit, and insisted on telling his side of the story. I agree that the officers thought that a big Black man ambulating toward them was a threat to their safety. I agree that the officers were momentarily concerned about the knife. I agree that Vaile, like other Black men, feared detention by law enforcement officers and did not immediately submit to the authority of white law enforcement officers. But all of these undisputed facts do not justify the battering of Darnai Vaile or charges of resistance. Rather the facts demonstrate that law enforcement when detaining Vaile and the State when prosecuting Vaile viewed the conduct of Vaile through the lens of white people who hold stereotypes of African-Americans as angry, aggressive, rebellious, and uncooperative. Black citizens are frightening to white people, particularly after dark.

The undisputed facts also establish that Darnai Vaile never verbally or physically threatened the officers, never swung at an officer, and told the officers he wanted to

44

cooperate. Vaile did not pull his knife on officers, and officers did not know of the knife until Vaile volunteered its presence. Vaile legally possessed the knife. The trial transcript undeniably confirms the State's employment of racist dog whistles.

The court majority writes that the dissent relies on facts outside the record. The court does not identify those purported facts outside the record. The majority, by this contention, likely faults the dissent for assuming a racist intent behind the law enforcement officers' actions and the State attorney's presentation of the prosecution's case against Darnai Vaile. The majority likely considers the dissent, when extrapolating racism, to have drawn inferences in a light favorable to Vaile rather than the prevailing party, the State. The majority likely also disapproves of the dissent's mining of history, newspaper articles, law review articles, and literature on the subject of racial discrimination and hatred in America at large and in Spokane County in particular.

In recent decisions the Washington Supreme Court has molded a new standard of review whereby a court evaluates remarks uttered by or conduct of a participant in the judicial process. The reviewing court must not seek to discern the subjective intent of the actor or speaker. Instead, the court must assume the role of a person who understands the history of race and ethnic discrimination and who knows that implicit, institutional, and unconscious bias, in addition to purposeful discrimination, impacts verdicts. *State v. Bagby*, 200 Wn.2d 777, 797 (2023); *Henderson v. Thompson*, 200 Wn.2d 417, 422 (2022); *State v. Zamora*, 199 Wn.2d 698, 718 (2022); *State v. Behre*, 193 Wn.2d 647, 664-65 (2019). A judge should not view the challenged remarks from the judge's own

45

perspective. *Henderson v. Thompson*, 200 Wn.2d 417, 438 (2022). Presumably this latter principle lacks importance if the judge already understands, based on a study of history, that implicit and explicit racism continue to pollute the American justice system.

The Washington Supreme Court's new standard of review assumes that a judge possesses an education about the history of race relations in the United States. Yet a judge need not have taken any history courses to attend law school or answer any history questions on the bar examination. Presumably the Supreme Court desires for a judge who lacks an understanding of race relations in United States to seek continuing education on the subject. Ostensibly the state high court encourages judges to peruse and employ history, newspaper articles, and essays on racism. The Washington Supreme Court does so in its own decisions.

The Washington Supreme Court's new standard of review further assumes that an objective observer of history will conclude that racial minorities in the United States have faced rampant bigotry and that white supremacy still prevails in America. The high court's new standard also assumes that all objective students of the criminal justice system will have adjudged the system to discriminate against ethnic minorities in implicit, unconscious, and institutional ways.

In its recent decisions, the Washington Supreme Court adopted what it calls the "objective viewpoint" of history as its own view. Nevertheless, scores of Washington judges also consider themselves to understand history from an objective standpoint and do not share this belief of continuing white supremacy or discrimination against racial

minorities in the United States, let alone in the American criminal justice system. Many Americans, including some judges, lament that reverse discrimination now poisons and ruins the United States.

I return to the court majority's assessment of this dissent. This court's majority also impliedly slates the dissent as exhibiting partiality, rather than neutrality, when exploring racism arising from the treatment of Darnai Vaile. This criticism bleeds into the majority's suggestion that the dissent considers the evidence in a light favorable to Vaile and reviews facts outside the record. The criticism conflates with the unstated reproach by the majority of the dissent for relying on history and current events. By so criticizing the dissent for partiality, the majority raises critical questions about the nature of judging and the role of judges. The majority tacitly disagrees with an appellate judge drawing conclusions from prosecutorial conduct based on a viewpoint of history demonstrating racism and institutional biases impacting the judicial system. The majority wordlessly rebuffs any role of a judge in proactively ending racism.

In response to the court majority's criticism, I unreservedly side with the Washington Supreme Court that an appellate judge should base decisions on the assumption that racial prejudice continues to unfairly impact racial and ethnic minorities. I conclude with the Supreme Court that history objectively establishes a long saga of racism that continues to impact decision making in America's judicial system. No one can seriously scrutinize history and current events without seeing rampant racism.

In response to this court majority's accusation of partiality, I plead guilty. I confess to this bias because of America's elongated history of slavery, servitude, the Ku Klux Klan, White Citizens' Councils, night riders, Christian cross burnings, violence, lynching, hatred, terrorism, domination, bodily intrusion, rape, whipping, intimidation, exclusion, insults, racist jokes, slurs, belittling, unfairness, arbitrariness, stereotyping, condescension, misunderstanding, profiling, driving while Black, walking while Black, law enforcement brutality, false indictments, pretend accusations, impossible bail, all-white juries, presumptions of guilt, acquittals for white on Black violence, summary convictions, wrongful convictions, unequal punishment, inhumane jails, Jim Crow laws, segregation, restrictive covenants, separate but equal, job discrimination, labor union discrimination, credit discrimination, insurance discrimination, neighborhoods exposed to environmental hazards, unsafe housing, inferior schools, the Southern Manifesto, massive resistance, subpar medical care, high infant mortality rates, decreased life expectancy, inability to create wealth, voting restrictions, false allegations of voter fraud, poll taxes, literacy tests, whitewashing of history, flying of Confederate battle flags, idolization of the Confederacy, rejection of affirmative action, refusal to utter the simple phrase "Black Lives Matter," and charges of perseveration leveled against African-Americans when asserting legal rights. I am convinced of persistent racism because of history's proven axiom that no group in power willingly relinquishes it.

When following the Washington Supreme Court's instruction to consider the lessons of history when rendering decisions, I apply the aphorism that iconic pictures

48

supersede the written page in explaining history, and my mind fixes on photographs, moving pictures, and diagrams sketched into memory. I am moved to partiality against racism when I conjure the diagram of Brookes' slave ship, the daguerreotype showing the back of a whipped slave, images of Black men hanging from trees as white crowds mill about below, the photograph of Emmet Till's indiscernible and mutilated face lying in an open casket, footage of grotesque, angry white visages screaming at Elizabeth Eckford as she sought to enter Central High School, a view of Medgar Evers' blood staining his driveway, a snapshot of gleeful Sheriff Lawrence Rainey jawing on chewing tobacco during his trial for murdering James Chaney, Andrew Goodman, and Michael Schwerner, the audio of the unyielding voice of Fannie Lou Hammer pleading for her vote to count before a Democratic National Convention committee, a photoshot of the bombed ruins of Birmingham's 16th Street Baptist Church, movies of girls clinging to trees as Bull Connor's fire hoses shoot high pressure water and attack dogs bark, the print of Andrew Young pointing from the balcony of the Lorraine Motel, blurry videotape exposing the clubbing and kicking of Rodney King, mugshots of the Central Park Five, pages of Jim Crow laws, and living documents imposing racial property covenants all provoke tearful emotion and compel anguished sympathy for the African-American race.

History persists. The historic examples of violent and discriminatory treatment of African-Americans engrained in my memory repeat themselves today, as if recurring nightmares, in new forms, patterns, circumstances, and locations. Body camera footage of a smug Derek Chauvin kneeling on the neck of George Floyd, cellphone video of

Gregory and Travis McMichael chasing a jogging Ahmed Aubery with the accompanying sound of a shotgun blast, the haunting 911 recording of Kenneth Walker hysterically sobbing and repeating that his girlfriend, Breonna Taylor, is dead after being shot by law enforcement officers, edited footage of Darryl Tyree telling Raleigh police officers he suffers heart problems as the officers repeatedly discharge stun guns, and film of law enforcement officers brutally and repeatedly punching and kicking Tyre Nichols inform me that skin-based bigotry endures in America and my empathy must endure.

When considering explicit race discrimination in America and its impacts on Darnai Vaile's prosecution in nonexplicit, or implicit, unstated, ways, I also consider the venue for Darnai Vaile's arrest and prosecution. African-Americans in Spokane currently encounter a poisonous milieu of overt acts of racism as described in articles cited below. The bigoted incidents occur within the backdrop of the Inland Northwest of northeastern Washington and northern Idaho being a mecca for white supremacy groups since the 1970s. Shawn Vestal, *NIC board scores big with Holocaust denier, not so much the bond raters*, The Spokesman-Review, January 6, 2023; *Racist letter delivered to Congressional candidate prompts police response in Spokane Valley*, The Spokesman-Review, December 9, 2022; *Gonzaga class taught by woman of color disrupted by "violent behaviors,"* The Spokesman-Review, September 16, 2021; *Washington Legislator Matt Shea Accused Of "Domestic Terrorism," Report Finds*, npr.org., December 20, 2019; Chad Sokol, *Racist propaganda targets diversity event at North Idaho College*, The Spokesman-Review, April 15, 2019; Daniel Walters, *Sheriff Ozzie on*

50

*GOP chair who hosted white supremacist: Told you so*, Inlander, August 2, 2018; Daniel Walters, *Spokane GOP chair hosts white supremacist James Allsup at event, accuses media of "label lynching,"* Inlander, July 31, 2018; *Spokane family forced to move after racist threats left on their door*, KHQ News, June 20, 2018; Shawn Vestal, *Burmese Refugee came too far to be greeted by flyer*, The Spokesman-Review, March 22, 2017; Jason Le Miere, *Race in America: "White Genocide" Warning Signs Posted at NAACP Building*, Newsweek, March 16, 2017. A 2018 FBI Hate Crimes Report chronicled that Spokane experienced more hate crimes than Des Moines, Iowa, Madison, Wisconsin, Portland, Oregon, and Tacoma, Washington combined. Megan Carroll, *Hate groups alive and well in Spokane region*, March 20, 2017, Spokane FAVS; "Spokane Office Of Civil Rights Equity and Inclusion, Spokane Community Against Racism," https://www.scarspokane.org/blog/2021/12/2/spokane-office-of-rights-equity-and-inclusion.

Conduct by and pronouncements from influential, powerful, and connected Spokane County citizens thicken toxic clouds of bigotry and animosity hovering over Spokane's criminal justice system. A former mayor of Spokane County's City of Airway Heights referred to President Barack Obama as "monkey man" and Michelle Obama as "gorilla face." Eli Francovich, "*Airway Heights Council asks mayor to resign following Facebook post,*" The Spokesman-Review, July 14, 2015; "*Airway Heights mayor rejects calls to resign over online comments,*" Spokesman Review, July 15, 2015; "*75+ more questionable posts by Airway Heights Mayor Patrick Rushing,*" The Inlander, July 15,

51

2015. Matt Shea, a member of the Washington State House of Representatives from Spokane Valley from 2009 to 2021, wrote a pamphlet entitled the *Biblical Basis for War* that advocated replacement of democracy with a theocracy and the killing of all males who do not adhere to Christianity or agree to follow fundamentalist Biblical law. *Washington Legislator Matt Shea Accused Of "Domestic Terrorism," Report Finds*, npr.org., December 20, 2019. The pamphlet copied operational philosophy from the Aryan Nation, once headquartered in northern Idaho. *Washington Legislator Matt Shea Accused Of "Domestic Terrorism," Report Finds*, npr.org., December 20, 2019. Shea participated in activities of groups that seek to create a white homeland consisting of Idaho, Montana, Wyoming, Oregon and Washington. Chad Sokol, *Washington state lawmaker Matt Shea defends advocacy for "Holy Army" as Spokane sheriff refers his writings to FBI*, The Spokesman-Review, November 1, 2018. After the Spokane chapter of the NAACP condemned the action of Representative Shea, City of Spokane Valley Mayor Rod Higgins defended the conduct of Shea and insisted on Shea being the target of unfair attacks. Chad Sokol, *Spokane Valley mayor comes to Shea's defense after report on anti-government plotting*, The Spokesman-Review, December 24, 2019.

When viewing Darnai Vaile's arrest and prosecution from the standpoint of an objective observer who recognizes the impact of racism on the criminal justice system, I notice that racial minorities suffer discrimination at the hands of Spokane County law enforcement.

> The Burns Institute and the Vera Institute of Justice have both documented disparities in people of color being detained and confined pre-

trial in Spokane County.  In Spokane County in 2014 for every 1 White adult detained

- 7.1 Black adults were detained
- 1.7 Latino adults were detained
- 6.2 Native American adults were detained

In addition, a separate report from the Burns Institute, documented higher bail amounts being given to Native and Black men.  While these reports are pre-pandemic, there is no data to show that these disparities have changed.  In fact, the case review criteria and subsequent releases are most likely exacerbating the existing disproportionality, resulting in people of color remaining in incarceration at even higher disproportional percentages.

*Smart Justice Spokane Coalition Is Extremely Concerned About Racial Inequities In Recent Jail Releases*, Peace and Justice Action League of Spokane, April 22, 2020.

A 2019 report prepared by the JFA Institute, a criminal justice research agency contracted by Spokane County, listed a disproportionate rate of incarceration rates of people of color than for whites, detrimental processing delays in filing charges, and an increasing racial disparity of criminal charges within the county.  SCAR, July 22, 2022; Doug Nadvornick, *Spokane County Bar Tackles Systemic Racism*, Spokane Public Radio, September 25, 2020.  An analysis performed by *The Spokesman-Review* and released in June 2020 showed that, over the course of one year, a Black person in Spokane was over five times more likely to be arrested by Spokane police than a white person.  *Black Spokane residents are 5 times more likely to be arrested, new data show*, The Spokesman-Review, June 14, 2020.

In 2021, a three-hundred-page report commissioned by the Spokane Police Department confirmed the use of force against Black and Native American arrestees more than other populations.  Megan Carroll, *Report: Spokane police more likely to use*

*force against Black, Native Americans*, KREM2 TV News, March 3, 2021. Black suspects are nearly three times more likely to be identified in crime reports as we would expect based on their population. Megan Carroll, *Report: Spokane police more likely to use force against Black, Native Americans*, KREM2 TV News, March 3, 2021. Native American suspects are 68% more likely to be identified as a suspect in a reported crime. Megan Carroll, *Report: Spokane police more likely to use force against Black, Native Americans*, KREM2 TV News, March 3, 2021. Black subjects are 22% more likely to have force used against them, and Native Americans are 49% more likely. Megan Carroll, *Report: Spokane police more likely to use force against Black, Native Americans*, KREM2 TV News, March 3, 2021. The largest racial disparities observed were discretionary searches by law enforcement officers of suspects. Megan Carroll, *Report: Spokane police more likely to use force against Black, Native Americans*, KREM2 TV News, March 3, 2021. Spokane Community Against Racism laments that the current Spokane County prosecuting attorney has reduced by half referrals to therapeutic courts, with a disproportionate impact on minorities. *Larry Haskell Speaks for Himself*, Spokane Community Against Racism (scarspokane.org), July 22, 2022.

Then there is the elephant in the room. The elected Spokane County prosecuting attorney's wife declares herself a white nationalist, warns of a race war, decries the end of the white race because of a low birth rate, called an African-American defendant and his family "pieces of vile garbage who are evil scum, wastes on society who should be annihilated," proclaimed the use of racial slurs appropriate for Blacks, Chinese, whites,

54

Hispanics, Jews, and gay people, and publicly employed the N-word for a Black journalist. Aila Slisco, *Prosecutor's Wife Publicly Calls Herself "Proud White Nationalist" To Much Backlash*, Newsweek, January 28, 2022; *Haskell apologizes for wife's racist comments on social media, but advocates say prosecutor needs to do more*, The Spokesman-Review, February 3, 2022; July 22, 2022, *Lesley Haskell isn't just racist; she organizes racism*," https://www.scarspokane.org/blog/2022/7/21/lesley-haskell-isnt-just-racist-she-organizes-racism; Daniel Walters, *Lesley Haskell, wife of Spokane County Prosecutor, calls herself 'White nationalist,' uses N-word as slur*, The Inlander, January 27, 2022; Bill Morlin, *Washington State County Prosecutor Under Fire For Wife's Anti-Muslim Comments*, Southern Poverty Law Center Hatewatch, March 10, 2015.

The Spokane County prosecuting attorney calls his wife's comments racist, but insists that she is not a racist. Daniel Walters, *For over 12 years, Prosecutor Haskell's wife's posts have sparked controversies about him and his office*, Inlander, February 11, 2022. A public official's refusal to recognize someone with such vigorous, vast, vituperative, and venomous views to be racist defies reason and commonsense. This denial impugns the integrity of the prosecuting attorney's office. The minority community fears less the overt racist than a public official who denies the existence of widespread racism. The Spokane County prosecuting attorney, despite claiming his wife's views not to be his own, has failed to loudly and publicly denounce those cherished views that once led to and prolonged slavery, continue to promote violence,

and incessantly and insidiously degrade the dignity of other human beings. Instead of reaching out to the African-American community, the prosecutor expresses outrage that the media uses his wife's comments to question his impartiality. Daniel Walters, *For over 12 years, Prosecutor Haskell's wife's posts have sparked controversies about him and his office*, Inlander, February 11, 2022.

The Spokane County prosecuting attorney seeks to distance himself from his wife, but his wife advertises her relationship with him. Lesley Haskell praises her husband's work while she preaches white supremacy. She proudly promotes her husband as the last line of conservative armor against a city gone "to shit." Daniel Walters, *Lesley Haskell, wife of Spokane County Prosecutor, calls herself 'White nationalist,' uses N-word as slur*, The Inlander, January 27, 2022. A supporter of a public official typically possesses parallel perspectives to those held by the official.

Despite the long history of bigotry and hatred toward racial minorities, despite the statistics about treatment of African-Americans in Spokane County, despite the overt racist acts in the community, despite the bigoted views of influential community members and leaders, and despite the racism exhibited by the prosecuting attorney's wife, the wheels of justice within Spokane County's white power structure blithely turn with the expectation that African-Americans will deem the criminal justice system unbiased and will quiescently bow to the authority of law enforcement and courts.

This court has done nothing to restore confidence in the judicial system in the estimation of the Spokane African-American community. The court majority's lack of

comprehension and recognition of racism in the travail of Darnai Vaile follows this
court's inability to understand the impact of racism in other cases. In *State v. Bagby*,
No. 36530-1-III (Wash. Ct. App. Apr. 20, 2021) (unpublished),
https://www.courts.wa.gov/opinions/pdf/365301_unp.pdf, *rev'd*, 200 Wn.2d 777, 522 P.3d
982 (2023), the deputy prosecuting attorney repeatedly employed the word "nationality"
to distinguish an African-American defendant from other witnesses, despite defendant
Tyler Bagby having been born in the United States and being a citizen. This appeals
court found "nothing to support an inference of racial bias in the prosecutor's misuse of
the term." (P. 4 of slip opinion). The Washington Supreme Court reversed this court.

In *State v. Zamora*, No. 37019-4-III (Wash. Ct. App. June 8, 2021) (unpublished),
https://www.courts.wa.gov/opinions/pdf/370194_unp.pdf, *rev'd*, 199 Wn.2d 698, 512 P.3d
512 (2022), the prosecuting attorney during voir dire repeatedly referred to border
security and drug smuggling despite United States citizen Joseph Zamora being on trial
for allegedly assaulting a police officer after Zamora was beaten nearly to death. This
court affirmed the conviction. We characterized the prosecutor's remarks as improper,
but harmless. We denied that the conduct implicated ethnic or racial bias, despite
Zamora's Latinx heritage. The Supreme Court reversed. The Court of Appeals also
refused to find a blatant appeal to racism as harmful in *State v. Monday*, 171 Wn.2d 667,
when the prosecutor talked about Black people maintaining a code of not testifying
against one another.

What was true fifty years ago remains true today:

Perhaps unconsciously, those who have major authority in the legal process tend to underplay the seriousness of racism in the judicial system, acknowledging the need for more progress, while extolling the elimination of overt segregation in the courts. These attitudes show little understanding of the continuing impact of racial bias on [B]lack victims of judicial injustice.

Derrick A. Bell, Jr., *Racism In American Courts: Cause For Black Disruption Or Despair?*, 61 CAL. L. REV. 165, 165-66 (1973).

Because of the absence of a unanimous court condemnation of the prosecution in this appeal, law enforcement officers and State attorneys will scoff at this dissent as an outlying, if not outlandish, view. State prosecutors and local law enforcement will ignore lessons to be learned by the thrusting of Darnai Vaile through the justice system and will disregard the suffering imposed by their bigoted behavior on the life of Vaile. The State's trial attorney will repeat race baiting during the retrial of Vaile. The constant silence of this court in this and other decisions dooms the criminal justice system to additional years of festering racism.

The court's majority also votes to reject publication of the majority opinion and this dissent, which vote diminishes the broadcasting of an illustrative paradigm of racism infecting Washington courts. The majority's decision to unpublish echoes the conduct of a local billboard proprietor. Lamar Advertising, which owns 1,300 billboard faces in Spokane, North Idaho, and Central Washington, rejected three requests, submitted by Spokane Community Against Racism, to purchase billboard space, in order to highlight police brutality and racial injustice in Spokane. *Lamar Advertising removes anti-mask*

*billboards, declines to display 3 of 4 ads from anti-racism group*, The Spokesman-Review, August 5, 2020.

Not only historic and current examples of brutality and hatred and not only statistics illustrating discrimination, but the travail of Darnai Vaile engenders my sympathy and partiality against racism. But neither Vaile in particular, nor Spokane's African-American community in general, want nor need my tears, anguish, or empathy. Nor do Vaile and his racial community ask me to deem them forever victims. Spokane's Black and other minority populations want and deserve from me and other judges, not pity, but recognition of their humanity, respect for their dignity, thoughtful reflection on their history, publication of their plight, and equal and fair treatment under the law.

I prefer to echo the chant of George Floyd protestors: "What do we want? Justice. When do we want it? Now." I prefer to parrot my friend Alec Stephens, who declares proudly and loudly after every recitation of the Pledge of Allegiance: "And justice for all."

I concur in part, dissent in part.

_____Fearing, J._____
Fearing, C.J.